PROVIDENCE WASHINGTON INS. CO.

v.

LOVETT.

Adm. No. 1764.

United States District Court, D. Rhode Island.

Oct. 21, 1953.

Marshall Swan, and John B. Dillon, Providence, R. I., for libellant.

Raymond E. Jordan, and Kirk Hanson, Providence, R. I., for respondent.

CLIFFORD, District Judge.

This is an admiralty action brought pursuant to the general admiralty jurisdiction and under Title 28 U.S.C. § 2201, whereby the libellant, the Providence Washington Insurance Company, seeks a declaratory judgment as to questions concerning the validity and enforceability of an insurance contract, civil and maritime, between the parties relating to the gas yacht, Braemar, owned by the respondent and located within the jurisdiction of this Court.

The libellant is a corporation, organized under the laws of the State of Rhode Island, located at Providence, and authorized to carry on a maritime insurance underwriting business. The respondent is the owner of the yacht Braemar, and a resident of Providence, in said State. No question is raised in this case relative to the jurisdiction of this Court.

On August 9, 1950, the libellant issued to the respondent a policy of marine insurance, insuring the yacht Braemar, and the respondent as owner, against the perils of the sea during the term of one year from August 9, 1950 to August 9, 1951. The policy of insurance contained a lay-up warranty that the said yacht "shall be laid up and out of commission from November 1st at noon until May 1st at noon."

On November 25, 1950, the Braemar, a 40 foot gasoline motor cruiser, was moored in the last or most outward finger slip on the south side of the main pier at Port Edgewood Marina. In the latter part of October, 1950, the respondent ordered the management of Port Edgewood Marina to haul up his yacht for the winter. Prior to November 1, 1950, the respondent caused to be removed from his said yacht the ship's papers, all navigation equipment, the wet batteries, all fresh water from the bilges, pumps, motors, etc., and all gasoline from the tanks. On November 25, 1950, storm warnings were received at Port Edgewood Marina and shortly thereafter his yacht, the Braemar, was secured by extra lines in a seamanlike manner by those in charge of the boatyard. The storm occurred late that day with easterly winds of high velocity. During this storm one or more of the lines, with which the Braemar was moored, slackened by force of the wind so that she rubbed against a protruding bolt in the slip and wore a hole in her side that caused her to sink. The damage to the Braemar was in the amount of three thousand dollars.

It was agreed between the parties that pleasure craft, similar in size and class

to the Braemar, were not customarily wet stored at Port Edgewood Marina for the entire winter season. Nevertheless, such craft were moored in the water out of service for the entire winter season at certain other specified locations in the Narragansett Bay area.

The pier herein mentioned extended out from the shore for a distance of approximately 150 feet and ran, generally, east and west, with the Providence River running, generally, north and south. Narragansett Bay was to the south of Port Edgewood Marina as indicated by the chart of this particular body of water. The pier was maintained on pilings as were the finger piers running from it in a northerly and southerly direction. The yacht, berthed as aforesaid, was tied up and facing in a southerly direction.

The Port Edgewood Marina pier was fully protected from the west. It was protected from the north and northeast by a Navy pier and land mass. On the east was the opposite shore line of the Providence River, less than a nautical mile distant and plainly visible from Port Edgewood Marina. Some distance southerly of the pier, a yacht club building was situated which protruded somewhat into the water. The pier, however, was completely unprotected from the southeast, in the direction of Narragansett Bay.

The libellant contends that the yacht Braemar was not laid up and out of commission on or prior to November 1, 1950, but was left moored and unprotected against the winter storms at Port Edgewood Marina; that on and after November 1, 1950, there was a breach of the warranty to lay up and decommission in that the respondent failed to haul her up on shore for the winter prior to November 1, 1950, and that as a result of said breach, the policy of insurance ceased to have any force or effect between November 1, 1950 and May 1, 1951. The libellant further contends that, as a result of the failure of the respondent to properly lay up and decommission said yacht, it was sunk on November 25, 1950.

The respondent contends that the yacht Braemar was laid up and out of commission prior to November 1, 1950, and was also laid up and out of commission at the time it was sunk on November 25, 1950; that the warranty to lay up and decommission was not breached as the libellant contends, but was, on the contrary, in full force and effect at the time of the sinking on November 25, 1950. The respondent further contends that there was a well-established custom and practice for the wet storage of boats at Port Edgewood Marina pending hauling up between November 1 and December 15 and that the Braemar was placed in wet storage in a safe place in accordance with this prevailing custom and practice. The respondent further contends that the libellant has, without cause, failed and refused to pay a just claim of insurance for the sinking of his said yacht.

The sole issue for determination by this Court is whether there was compliance with the lay-up warranty contained in the yacht policy issued by the libellant to the respondent.

It is a well-established principle, as stated in Gelb v. Automobile Insurance Co. of Hartford, 2 Cir., 168 F.2d 774 at page 775, that "parties are presumed to contract with reference to general customs and usages which explain the specific meaning of a term used and personal knowledge of the customary meaning need not be had by the parties to the contract."

Evidence was adduced by the libellant and the respondent relating to the practice or custom existing in the Port of Providence and Narragansett Bay generally, and particularly at Port Edgewood Marina, in order to explain the meaning of the words "laid up and out of commission from November 1st at noon until May 1st at noon," and thereby determine their applicability to the facts in the instant case. The libellant produced four witnesses—namely, Frederick Arnold Shaw, Carl Hintze, Edwin E. Davies, Jr., and Malcolm MacNaught, Jr. The respondent produced two witnesses—

namely, John H. Mason and Christopher L. Migliaccio.

 Each of these witnesses gave somewhat different versions and interpretations of the meaning of the words "laid-up and out-of-commission" as these words apply to the facts in the instant case. To some these words taken together meant "out of service," whether the boats were in the water or on shore. As such, the words "laid up" and "out of commission" were synonymous. To others the words "laid up" had a very different meaning from "out of commission." Therefore, it was entirely proper, and indeed necessary, to introduce evidence to explain and interpret the meaning of these words. Such evidence was competent because the words "laid up and out of commission" were ambiguous and uncertain in the minds of various individuals when applied to local custom and practice.

All of these witnesses were familiar with the existing custom and practice relating to the laying up and decommissioning of boats in Narragansett Bay, Providence River, and Port Edgewood Marina. They were all in accord that boats of the type and class of the Braemar were laid up in wet storage for the entire winter in the Narragansett Bay area at several other locations. They were, likewise, in accord that it was not the practice or the custom to lay up boats of the Braemar type in Port Edgewood Marina in wet storage for the entire winter.

The owner of the boat yard and pier at Port Edgewood Marina, Mr. Migliaccio, testified that he did not solicit such business and that 90% of his income was derived from the brokerage of boats, but that he did accommodate some of his older and better customers by hauling their boats on shore as soon as possible, both before and after November 1st; that on no occasion were any boats left in wet storage later than December 15th.

All of the other witnesses were also in accord that boats were left in wet storage in Port Edgewood Marina after No-vember 1, but not later than the end of November or early December.

The evidence clearly indicates that the customary procedure at Port Edgewood Marina for laying up and decommissioning boats such as the yacht Braemar was to haul them prior to November 1st, if possible, and then completely winterize them on shore. However, the evidence is also clear that this procedure varied, depending upon various other factors involved at this time. For instance, if the fall weather were pleasant, or the fishing in Narragansett Bay were good, the boats were retained by their owners in active service until the last moment—that is, until the latter part of October. On this late date the owners were accustomed to order their boats hauled up, specifying the berths desired. After having them completely winterized in the manner indicated, the boats were tied up in slips and moorings and hauled up on shore as soon as time and facilities permitted after the first day of November. Therefore, the last boat would not be hauled up until the latter part of November, or, at the latest, the middle of December.

 This Court, therefore, finds that it was the well-established practice and custom at Port Edgewood Marina, depending upon the factors herein stated either (1) to haul boats up on shore prior to November 1, if possible, and then winterize them on land, or (2), if such action was not possible by November 1, then to place such boats, completely winterized, in slips on either side of the piers in wet storage for a reasonable length of time pending hauling ashore, and in no circumstances later than the fifteenth day of December. The words "laid up and out of commission", contained in the insurance policy, must be interpreted and defined in accordance with this well-established custom and practice at Port Edgewood Marina.

 A view of this entire area was had by this Court, accompanied by the parties in interest and their attorneys. Having in mind the observations made of this area, the weather conditions or-

dinarily prevailing during the summer, fall and winter months, and the custom and practice at Port Edgewood Marina as herein found, it is the opinion of this Court that Port Edgewood Marina is regarded as a reasonably safe place to lay up boats in wet storage during the period between November 1 and December 15.

The evidence adduced clearly indicated an intention to lay up the Braemar in wet storage only for a very limited period of time in accordance with the long-established custom of this port.

It is undisputed that the respondent requested in late October that his yacht be hauled up on shore. It was thereupon completely winterized and placed in wet storage prior to November 1, at the location already indicated. The Braemar, secured in a seamanlike manner, remained there, pending hauling up, until November 25, when it sank.

This Court is not called upon to decide and does not decide whether Port Edgewood Marina is a safe place to "lay up and decommission" in wet storage boats of the Braemar type and class for the entire winter.

Libellant cites Gelb v. Automobile Insurance Co. of Hartford, 2 Cir., 168 F. 2d 774, as authority for its contentions. This case can be distinguished from the case at bar because of factual differences. In the Gelb case, the boat in question was left afloat, moored to two dolphins, about 500 feet off shore in open water until November 29, when she sank. Such other things relating to laying up a yacht for the winter as disconnecting or removing the batteries, removing water from the bilges, pumps, motors, or tanks and draining tanks were not done.

In Gelb v. Minneford Yacht Yard, D. C., 108 F.Supp. 211, additional facts are disclosed, all relating, however, to the same incident. It appears that the owner of the "Edward James" left his yacht, at the location stated without substantially winterizing her; that it was his intention to haul this boat on land only in the event he failed to dispose of her

by sale; that he instructed the owner of the yacht yard not to haul her until he gave instructions to do so; that he did not give such instructions until November 20, although he had been warned by the owner of the yacht yard that he should give those instructions at the earliest possible moment because such action would have to await the hauling of other boats for which he had received prior orders; and that the yacht Edward James was unprotected and not winterized during this period of time when she broke from her moorings and sank from some unknown cause.

■ The law is well settled that in contracts of insurance where a doubt exists as to the meaning of words contained therein which may be construed either in a strictly literal sense or in a broad sense, that these words must be given the broad meaning because the insurance carrier has it within its power to spell out clearly all of the terms and conditions in plain, concise, unambiguous, and understandable language. Failing to do so, the words in question must be construed against it.

In consideration of the following factors:

(1) that it was the intention of the respondent and that of the boat yard management, likewise, to lay up the yacht, Braemar, in wet storage in accordance with the usage and custom of this port and, therefore, not later than December 15, 1950;

(2) that in conformance with the well-established custom at this port the yacht, Braemar, was completely winterized and placed in wet storage at this port prior to November 1;

(3) that Port Edgewood Marina was regarded as a reasonably safe place for wet storage for boats of the type and class of the yacht, Braemar, during the period of time between November 1 and December 15; and,

(4) that in view of the legal principles herein stated;

this court, therefore, finds that the yacht, Braemar, was "laid up and out of com-

mission" when she sank on November 25, 1950.

It is therefore Ordered, Adjudged, and Decreed that all of the prayers contained in the libel and complaint of the libellant, be and hereby are denied, and,

It is further Ordered that the prayer contained in the answer of the respondent that he be entitled to recover from the libellant all loss and damage suffered by reason of the sinking of said yacht and covered by said policy be and is hereby granted.