Walter W. DIERKS et al., Plaintiffs,

v.

Rupert C. THOMPSON, Charles P. Williamson, Clarke Simonds, Royal Little, and George William Miller, as they are Trustees of the Market Square Trust, Defendants.

Civ. A. No. 3238.

United States District Court
D. Rhode Island.

Jan. 21, 1969.

Leon L. Rice, Jr., of Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., and Joachim A. Weissfeld, of Graham, Reid, Ewing & Stapleton, Providence, R. I., for plaintiffs.

Jay H. Topkis, Allan Blumstein, and Stephen L. Hammerman, of Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, and Edward F. Hindle, and Richard M. Borod, of Edwards & Angell, Providence, R. I., for defendants.

## OPINION

### Statement of Facts

PETTINE, District Judge.

This action is brought by twenty-one former employees of the Amerotron Company Division (Amerotron) of Textron, Inc. (Textron) now residing in various states throughout the country as a class action on behalf of themselves and all other employees similarly situated as of April 15, 1963 and who were on that date members of the Textron Profit Sharing Plan and Trust ("the Trust" or "the Plan").

The plaintiffs claim that by virtue of a sale by Textron of Amerotron on April 15, 1963, there was effectuated not only a termination of employment of the employees in Amerotron participating as

members in the Profit-Sharing Plan but also a termination or partial termination of the Plan as applied to such members.[1] Accordingly, they ask the court to order that all former Amerotron employees receive their interests in the Trust forthwith, or their interests be segregated and administered as a separate fund. Plaintiffs further demand an accounting, injunctive relief and costs.

The defendants, residents of Rhode Island, are the trustees of the Textron Profit Sharing Plan. It is their theory that the provisions of the Plan dealing with termination of the Plan are, for various reasons, inapplicable and that in accordance with certain specific language of the Plan, they have properly administered the funds allegedly owed to the plaintiffs. They further claim that the plaintiffs seek relief which would violate the rights of persons who are now members of the Plan and deprive those persons of valuable benefits under the terms of the Plan.[2]

1. This is a class action pursuant to Rule 23 of the Federal Rules. The class consists of the named plaintiffs, except one, whose withdrawal was permitted after the action was instituted, and all other former employees of Amerotron who on April 15, 1963 were members of the Plan, except those who have received payment from the Plan by reason of their death, disability, or having reached the age of 60 and except those who have released the Plan from any claim arising from the sale of Amerotron.

The size of the initial class was 382. However, in accordance with stipulation that class has been reduced to 274 as of March 1, 1968.

Under the supervision of this court, it has been stipulated to that (1) the amended Rule 23 is applicable here; (2) this is a properly maintainable class action; (3) notice requirements have been complied with.

Accordingly, all persons who are members of the above-described class as of the date of the entry of judgment in this case are bound by such judgment as of that date.

2. *Pertinent Paragraphs of the Plan*
1.04(c) " 'Subsidiary Company' means any subsidiary of the Company (Textron, Inc.) which from time to time may be included in the Plan by appropriate action of the Board of Directors of the Company and may also be construed as referring to all said subsidiary companies together."
1.04(d) " 'Employer,' means the Company (Textron, Inc.) and any of the Subsidiary Companies referred to in subparagraph (c). When the word 'Employer' is used with reference to particular Eligible Employees it shall be deemed to refer to the employer by which such eligible employees are employed."
1.04(h) "On or after September 10, 1955 the term 'Eligible Employee' means

* * * (b) employed by a subsidiary company or affiliate which has been or may be included in the Plan pursuant to section 13.03 hereof. A person not employed in or by one or more of such divisions, offices, subsidiaries or affiliates shall not be eligible to be a member of the Plan * * * "
2.03 "Membership shall cease upon termination of employment of a Member for any reason * * * "
3.01(b) "For each fiscal year of the company commencing with the fiscal year 1956, the company shall contribute for the benefit of those eligible employees employed by the company in each of the several divisions (excluding the executive offices and the industrial building department referred to in subparagraph (a) hereof) covered by the Plan, amounts equal to the lesser of (1) ten per centum (10%) of the net profits of the particular division and (2) fifteen per centum (15%) of the compensation otherwise paid or accrued during the fiscal year to the members under this Plan who are employed by the particular division."
3.03 " * * * net profits of the particular division for the purposes of sections 3.01(b) and 3.02(a) shall be computed as if the division were a separate entity * * * "
4.01 "The annual contributions made by Textron, Inc. shall be respectively allocated among the accounts of the eligible employees of the respective divisions and offices * * * in proportion to their compensation from the employer * * * "
5.04 "A member who transfers from one division or office of Textron, Inc. to another division or office of Textron, Inc. * * * shall not be deemed hereunder to have terminated his employment * * * "
6.01(a) "The full amount of a Member's account shall become nonforfeitable upon termination of employment for any reason, including death, except upon termi-

In their original answer, the defendants stated that the complaint fails to state a claim upon which relief can be granted. However, by a subsequent

nation resulting from a discharge for good cause shown * * * "

6.04 "Distribution shall be made by the Trustee from the Trust Fund for the Members only at the following times and in the following manner:

(a) As soon as feasible after termination of membership of a Member with respect to whom any portion of whose account has become nonforfeitable as provided in paragraph 6.01, the Trustees shall determine the distributable amount of his account which shall be an amount equal to the balance of his account as of the close of business on the December 31 preceding or concurrent with such termination. Such amount is herein generally referred to as the 'Distributable Amount.'

(b) (2) The Trustees shall continue to hold as part of the mingled fund the balance of the distributable amount * * * until the death of such former Member when it shall be distributed in accordance with subparagraph (c) hereof or until such former Member shall become totally disabled or shall attain age 65 when the Trustee shall distribute such amount to such former Member in a single cash payment, whichever of such events shall first occur."

6.05 "After termination of a membership of a Member his account shall not be entitled to be credited with any portion of any amount contributed for any period after the date specified in paragraph 6.04(a) for the determination of such distributable amount and shall not be adjusted for any forfeiture or for any increase or decrease of the mingled fund after said date."

10.01 "It is the expectation of each Employer that it will continue the Plan as long as permitted hereby, but its continuance and the making of contributions by each Employer in any year is not assumed as a contractual obligation by the Employer and the right is reserved to each Employer to discontinue the Plan so far as it is concerned. The Plan may be discontinued by any Employer as to itself by notice by the Employer in writing to the Trustees at any time to that effect. The Plan shall terminate as to a particular Employer upon the occurrence of any one of the following events:

(a) If the Plan is discontinued in the manner set forth above;

(b) If the Employer is dissolved or adjudicated in bankrupt or an insolvent in appropriate proceedings;

(c) If the Employer shall lose its identity by merger, consolidation or reorganization into one or more corporations or organizations which shall not become a party to this agreement within sixty days after such merger, reorganization or consolidation."

10.02 " * * * and the assets remaining (after payment of liabilities) shall be distributed, either in cash after being converted into cash or partly in cash and partly in kind as the Trustees in their discretion may determine, among all the eligible employees of the employer with respect to whom and to which the Plan is being terminated in proportion to the balances of their accounts; provided, however, that the time and manner of distribution of said balance shall be the same as in the case of termination of employment as set forth in paragraph 6.04."

"The Plan provides for contributions by the Company with respect to eligible employees of each included employee unit in an amount equal to the lessor of (a) 10% of such unit's net profits before taxes, as defined in the Plan, or (b) 15% of the compensation paid to such eligible employees. Net profits of the employee unit are determined after specified deductions, including certain charges based upon the net worth of the unit.

"Each member's share or contribution is determined on the basis of the ratio of his annual compensation to the total of annual compensation paid to all members of his employee unit. Members share in the net earnings of the Trust on the basis of the ratio of the amount of their vested interest to the total amount of the vested interests of all active members. The account of each member is fully vested except in case of discharge for cause. On death, on total disability, on retirement at or after age 65 or on reaching age 65 if his employment has earlier terminated, the amount of the member's account will be paid to him or his beneficiary. For 1963 the Company's contribution will be approximately $455,470. It is not possible at the present time to state what the ultimate amount payable to any officer will be under the Plan."

13.03 "By appropriate action the Board of Directors of Textron, Inc. may, as of a specified date, which may be either before or after such action of the Board, (a) include any: subsidiary, direct or indirect, or affiliate of Textron, Inc., as a party to the Plan for the purposes of including within the benefits of the Plan

series of pre-trial orders and stipulations it has been decided that stipulated facts would be the basis for judgment by the court and that all contested questions of both substantive law, dealing with the construction of the Trust, and evidentiary law, dealing with the materiality and relevancy of certain exhibits, would be resolved by the court. Accordingly, the court will treat this as a combined motion for summary judgment by both sides pursuant to Rule 56(a), (b), in which there is no disagreement as to the facts and considerable disagreement as to several matters of substantive and evidentiary law.

All parties are properly before the court, and the court has jurisdiction of the parties and the subject matter of this action.

### The Plan

The Plan, established in 1951 by the unilateral act of the Textron Board of Directors, has been and is completely employer-financed, with no contribution ever having been made by any employee. It relates to Textron and certain participating subsidiaries or divisions ("the employers") who made contributions from their net profits in accordance with a formula prescribed by the Plan.

These contributions were allocated among the accounts of its employee-members in proportion to their compensation from the company for the calendar year for which the contribution was made. The funds and properties constituting the accounts of all of the members are held and invested in one mingled fund by the Trustees, who keep separate accounts with respect to each member.

At the end of each year, the Trustees credit each employee member's account with the increase or decrease in value experienced by the Trust during the year, allocated in proportion to the employee's account as of the end of the year.

The Plan is open to all salaried employees who are exempt from the hourly wage provisions of the Fair Labor Standards Act of 1938 and who have been employed by the company for a certain minimum period of time. The value of a member's account is paid to him when he reaches age 60 or earlier suffers total disability or death. Upon an employee's termination of employment for any reason, except for good cause, his membership in the Plan terminates and the full amount of his account becomes fixed and nonforfeitable. His account is no longer credited with any portion of subsequent increases or decreases in the value of the Trust corpus. However, in December 1966 the Trust was amended and as of January 1, 1967 employees have been entitled to annual credits to their account up to a maximum for any year of 3½% of the account balance as of the end of the preceding year, provided the net profit of the mingled fund is sufficient to justify such credits.

Directors of Textron and Trustees of the Plan do not participate as such. They do participate, however, if they are also employees and therefore eligible under the Plan.

In April 1963, after the sale of Amerotron's assets, the membership of its employees in the Plan terminated and the Trustees fixed the amounts ultimately distributable to those employees. No further amounts were added to their accounts through the allocation of sub-

the employees of such subsidiary or affiliate, or of one or more divisions of such subsidiary or affiliate, or (b) provide that any of the divisions or offices of Textron, Inc. shall be included within the Plan for the purpose of including within the benefits of the Plan the employees of such division or office."
*Proxy Statement*—The Company has a non-contributory Profit Sharing Plan and

related Trust which was established in 1951. Members include eligible salaried employees of certain divisions and subsidiaries of the Company who are exempt from the over-time provisions of the Fair Labor Standards Act of 1938. No director as such is included in the profit sharing plan.

sequent yearly contributions, and no further increases or decreases were credited or charged to them. Allegedly in accordance with the Plan, their balances became fixed assets, available at age 60, total disability or death.

### Historical Development of Amerotron

Amerotron Corporation, a Delaware corporation, was incorporated on October 1, 1954, with one-third of the stock being owned by Textron, one-third by American Woolen Company, and one-third by Robbins-Mills, Inc. On February 24, 1955 as a result of a merger between Textron, American Woolen Company and Robbins-Mills, Inc., Textron acquired the Amerotron Corporation as a wholly owned subsidiary. On December 30, 1955 Amerotron Corporation was merged into R. W. Bates Piece Dye Works, Inc. and immediately upon such merger the name R. W. Bates Piece Dye Works, Inc. was changed to Amerotron Corporation. On June 28, 1956 Amerotron Corporation was liquidated into Textron and became known as the Amerotron Division. On April 15, 1963 assets of Amerotron were sold to Deering-Milliken, Inc. which did not become a party to the Plan.

The Plan, originally designed for the participation of a parent and subsidiary corporations, changed its character as Textron began to alter its corporate profile through diversification. From the date of the Plan's inception to the commencement of this action all of the organizations whose employees were members of the Plan and which were sold or terminated by Textron were divisions and not subsidiaries, excepting R. W. Bates, Inc. From 1957 until this action was brought and thereafter, the employees who were members of the Plan worked for offices or divisions.

## OPINION

■ It can hardly be denied that profit sharing and pension arrangements recognize the realities of the labor market and are in essence hard-headed business devices with multi front economic benefits to industry. Whether viewed by the employer as a means for attracting and holding employees or as a legitimate method to obtain favorable tax treatment, the ultimate result of a profit-sharing plan is to enhance prospects for stability in the labor force, increased productivity and, as a consequence, greater profits. The employee in rendering service in response to the plan consummates a contract creating a binding interest in a fund which in turn constitutes an investment of his money. This he has earned no less than the salary paid to him each pay period. The benevolence of the employer, if it might be called that, carries with it so heavy a return that it defies denomination as a gratuity. A contract is created as to funds contributed which must be viewed as earned employee investments.[3]

---

3. "Because of the exigencies of the Internal Revenue Code, the modern day methods of compensation and the language of the profit-sharing plan itself, we must view the interest of the plaintiff in the trust fund as a contractual one. The plan is an offer to pay the employee his interest on that share of it to which he is entitled which is accepted by the employee once he satisfies the service requirements." Hatten v. Worden, D.C., 38 F.R.D. 496. In the same vein Russell v. Princeton Laboratories, Inc., 50 N.J. 30, 231 A.2d 80; Siegal v. First Pennsylvania Banking & Trust Co., D.C., 201 F. Supp. 664. In this latter case the court distinguishes having an employer continue a plan from rights claimed in a fund already segregated. In Hurd v. Illinois Bell Telephone Co., D.C., 136 F.Supp. 125; 234 F.2d 942, cert. den., Seybold v. Western Elec. Co., 352 U.S. 918, 77 S.Ct. 216, 1 L.Ed.2d 124 the court said, " * * * a careful reading of the decisions indicates, however, that even the states following a strict view of pension plans would enforce employees' rights in a separately established trust fund."

Under Sections 401 and 404 of the Internal Revenue Code of 1954, U.S. Treasury Regulations, Section 1.401-1(b) (ii), contributions of an employer are deductible as ordinary and necessary business expenses.

To this the defendants can offer no exception.

A contract having been created, the court must look to the terms of the instrument to establish the respective rights of the parties.

The defendants argue that the terms of the Plan are explicit and mandate a finding that when the Amerotron assets were sold, the plaintiffs ceased to be employed by Textron and as a consequence their membership in the Plan terminated, and the funds thereupon became frozen and nonforfeitable[4], to be distributed only as provided in paragraph 6.04, that is, at age 60 or earlier total disability or death.

It appears to this court that it need not quarrel with such a contention, for the heart of the issue is focused on the end result of the Plan as to the employees of Amerotron upon the sale of that division.

If Amerotron Company Division was an employer and lost its identity by merger, consolidation or reorganization into one or more corporations or organizations which did not become a party to the agreement within sixty days after such merger, reorganization or consolidation, then the Plan terminated as to such employees.[5] This then presents the inquiry as to the manner of distribution to be employed. The defense contends that the provisions of 10.02 control which directs that the balances in the fund are to be the same as in the case of termination of employment as set forth in paragraph 10.02 as it refers to section 6.04. The plaintiffs, however, argue that said paragraph 6.04 provides for payment at some future date and lack of

reference in 10.02 to 6.05, which in effect freezes the accounts, together with certain ambiguities created by defendants' reading of sections 10.02, 6.04 and 6.05 prohibit the withholding of payments and the lack of sharing in the earnings, growth and forfeitures by those who are still members of the Plan. Hence, it is argued, the Plan clearly contemplates two distinct occurrences, termination of employment on the part of an employee and termination of the Plan, the former occurring at the employees' discretion or upon his death, the latter coming when certain events, entirely beyond the control of the individual employee, occur in the corporate existence of his employer.

The court will now discuss the specific issue to be resolved.

■ It is quite well established that the terms of a plan cannot be rewritten to accommodate any party. The language controls the rights of all employees, including those who have lost their jobs through the sale or termination of a division of their employer.[6] It is to the language of the Plan that this court resorts to answer the query *whether or not the sale of assets of Amerotron caused a termination or partial termination of the Plan.*

### *Amerotron was an "Employer"*

■ The Plan can only terminate as provided in paragraph 10.01(c) supra, which brings us to the determination of "employer."

Paragraph 1.04(d) defines "employer", but together with this we must resort to certain other provisions of

---

4. Paragraphs 2.03, 6.01(a) and 6.05 of the Plan, supra, note 2.

5. Paragraph 10.01(c) of Article X, supra.

6. Schneider v. McKesson & Robbins, Inc., 254 F.2d 827 (2d Cir. 1958); Finnell v. Cramet, Inc., 289 F.2d 409 (6th Cir. 1961); Local Lodge 2040, Int'l. Ass'n. of Machinists, etc. v. Servel, Inc., 268 F. 2d 962 (7th Cir.), cert. denied, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959);

Dixon, Jr. v. McKim, 3 CCH Pens. Plan Guide, paragraph 19,028 (Pa.C.P. Allegheny Co.1968); Fernekes v. CMP Industries, Inc., 13 N.Y.2d 217, 246 N.Y.S. 2d 201, 195 N.E.2d 884 (1963); Bailey v. Rockwell Spring and Axle Co., 13 Misc.2d 29, 175 N.Y.S.2d 104 (Sup.Ct. N.Y.Co.1958); Kravitz v. Twentieth Century-Fox Film Corp., 5 Misc.2d 368, 160 N.Y.S.2d 716 (Sup.Ct.N.Y.Co.1957); Gorr v. Consolidated Foods Corp., 253 Minn. 375, 91 N.W.2d 772 (1958).

the Plan and construe them together. In this court's opinion, they show that the thrust of the Plan as amended is to treat a division as a separate employing unit.

An analysis of the provisions of the Plan follow a convincing line to this end. In capsule form, for that is all that is necessary to establish this point, the court finds the following sections of the Trust significant for this purpose.

1) Sec. 13.03—Board of Directors of Textron has power to include within the Plan a particular division of Textron and extend the benefits of the Plan to its employees.

2) Sec. 13.03—an employee of such a participating division then becomes an "Eligible Employee" as defined in Section 1.04(h).

3) Article III Section 3.01(b) defines the contribution in terms of the net profits of a particular division.

4) Section 3.03—recites that net profits of a particular division are in turn to be computed, "as if the Division were a separate entity in fact."

5) Section 4.01—provides for the allocation of Textron's contribution among the accounts of the eligible employees of the respective divisions in proportion to their compensation from the "employer."

6) Section 5.04—contemplates the transfer of employees from one division to another and states that such a transfer shall not be deemed a termination of employment.

7) Finally Textron's proxy statement distributed with its annual meeting of April 15, 1964 in using the term "employee unit" clearly demonstrates Tex-tron's intention to treat its divisions as distinct employing units for purposes of the Plan.

All this leads to the one conclusion that it was intended to treat each division of Textron as a separate employer with respect to the employees of that division. Therefore, Amerotron was an employer within § 10.01(c).

*Did the Sale of Amerotron Terminate the Plan as to its Employees*

Since this court has determined that Amerotron was an employer, the effect of its sale on the Plan as to its employees must now be determined.

It is this court's opinion that termination, distribution and allocation must be as in section 10.02 which in turn refers to section 6.04 which in turn remains significantly silent as to section 6.05.

Article X of the Plan deals with termination and continuance and the applicable section thereof is 10.01(c) which provides for termination as to a particular employer where such employer loses its identity by merger, consolidation or reorganization into one or more corporations or organizations which do not become a party to the Plan.

Though the word sale is not used in said section, the court does not believe it can seriously be argued that the use of such word is necessary since such an event is clearly within the meaning of the terms used.[7]

Amerotron being an employer and Deering-Milliken, Inc. the purchaser having elected not to become a party to the agreement as set forth in section 10.01 (c)[8], it follows that the sale of the as-

---

7. "Consolidation of Corporations by Sale of Assets and Distribution of Shares," 19 Cal.L.Rev. 349, "Consolidations, mergers and sales are popularly known as 'reorganizations', 'mergers' or 'combinations' and rarely is a sale called a sale." Cf. Ballantine on Corporations at 663 (1946 ed.).

8. "Furthermore, Deering-Milliken, Inc. is covered by the phrase 'one or more cor-porations or organizations which shall not become a party to this agreement' found in Section 10.01(c). Had the draftsman of the Plan intended to limit the application of this Section to those transactions resulting in a merger, consolidation or reorganization of a 'particular employer' with another subsidiary or affiliate of Textron, more precise language should have been employed as was done in Section 13.03."

sets of the Amerotron Company operated to terminate the Plan as to Amerotron employees and, contra to defendants' contention, it is this court's opinion that such sale does effect the outcome of this action. Though paragraph 10.02 states that, if the Plan is terminated as to an Employer, the time and manner of distribution of the balances in the fund are to be the same as in the case of termination of employment as set forth in paragraph 6.04, i. e., on death, total disability or attainment of age 60, it says nothing concerning the "freezing" of the accounts pursuant to § 6.05 as is the case when employment is terminated. Absent such a reference, it must be inferred from such silence that the Plan contemplated two distinct occurrences: Termination of employment on the part of an employee and termination of the Plan. Moreover, where ambiguities arise from the failure to set forth intentions clearly, inferences must be drawn favorable to the non-drafter.[9] And, in addition, as plaintiff's counsel made clear on oral argument, § 6.05's reference to the "mingled" fund is incompatible with section 10.02's reference to a segregated fund. It could hardly be supposed that funds segregated from the original trust into a separate trust for the benefit of employees whose employment has been terminated by the same corporate transformation which has terminated the Plan should remain at the disposal of the original trust and increase or decrease to the benefit or detriment, respectively, of non-terminated employees. Such a construction of the Plan would demand a judgment that segregation under § 10.02 of the Plan is a wholly vain act. The reasonable construction is, then, that § 10.02 requires segregation of funds which are to be separately administered in accordance with sound fiduciary principles and are, in compliance with § 6.04, to be paid over, as increased or decreased, upon death, total disability or attainment of age 60.

The defendants have claimed that no relevance attaches to the amounts of the fund vested in certain officers of the corporation who are also the trustees of the Plan. While there is no claim here of bad faith, there can be little doubt that some weight must be ascribed to the fact that vast benefits flow to these gentlemen as officers by virtue of the construction they have enforced as trustees and now advocate as litigants. Hence, in interpreting this Plan, the court cannot help but be mindful of the personal involvement of the trustees which mandates the closest analysis of the Trust language.[10] The court simply

---

9. Russell v. Princeton Laboratories, Inc., 50 N.J. 30, 231 A.2d 800, "Indeed, these plans are to be liberally construed in favor of the employee."

See also Frietzsche v. First Western Bank & Trust Co., 168 Cal.App.2d 705, 336 P. 2d 589; Voigt v. South Side Laundry & Dry Cleaners, Inc., 24 Wis.2d 114, 128 N.W.2d 411. Ulman v. Sunset McKee Company, 221 F.2d 128, "If there is doubt, the employee (and his estate) if the employer selects the words, should have the advantage of his boss's language which is susceptible of two intrinsically reasonable but opposite constructions." Cf. Providence Washington Insurance Company v. Lovett, 119 F.Supp. 371, 375 (D.C.R.I.1953):

"The law is well settled that in contracts of insurance where doubt exists as to the meaning of words contained therein which may be construed either in a liberal sense or in a broad sense, that these words must be given their broad meaning because the insurance carrier has it within its power to spell out clearly all of the terms and conditions in clear, concise, unambiguous and understandable language. Failing to do so, the words in question must be construed against it."

10. "The employees of the Amerotron Division first became members of the plan for the year 1957. As of December 31, 1957, the vested balances of the 345 Amerotron employees totalled $315,546.16. * * * As of that date, in addition to the Amerotron employees 462 employees of other Textron divisions, and the corporate office of Textron were then members of the Plan. All of these vested balances comprised the total fund known as the Market Square Trust. As of December 31, 1962, the end of the year preceding the sale of Deering-Milliken, Inc. in March of 1963, the total vested bal-

cannot be overly impressed by an argument of immateriality and irrelevance which focuses not on the realities of financial gain but on the technicality of the role being played.

*The Effect of Termination on Present and Former Members of the Plan*

Defendants contend that relief should not be granted plaintiffs because to do so will effect seriously the rights of

ances of the Amerotron employees alone had grown to $1,375,078.62. \* \* · \* This increase is attributable to several factors. Employer contributions and forfeitures of the interests of those discharged for cause all contributed to the increase. In addition, however, the earnings of the fund and the appreciation of the securities held by it greatly contributed to the gain.

"As of December 31, 1962, 382 Amerotron employees were still members of the plan along with 872 members who were employees of other divisions and Textron's Corporate Office. \* \* \*

"In addition to these active members of the plan, employed by various divisions of Textron and its corporate office, there were former employees who had an interest in the Plan but whose interest would not be distributed to them until death, total disability or attainment of age 65. When the Amerotron employees first joined the plan, the number of active employees exceeded those whose employment had been terminated and who were awaiting the occurrence of any one of the three contingencies at which time they would receive their distribution. But the number of active employees who were members of the Plan began to dwindle while the number of those who were 'frozen in', so to speak, increased, until by 1963 there were 448 active employees who were members of the Plan and 1198 whose status the Defendants had determined as non-members of the Plan. \* \* \*

"After 1963, the same trend continued, so that as of 1967 the number of active employees had dropped to 424 while the number of former employees, now no longer members as far as the Defendants are concerned, rose to 1203. \* \* \* The market value of the fund as a whole had grown from $4,429,106.61 in 1959 to $6,349,172, as of December 31, 1962, and, as of December 31, 1967 stood at $14,-322,451. \* \* \*

"For the years, 1959 through 1963, employer contributions totalled $3,003,928.10 while the growth in market values for the same period amounted to $3,072,155.-39 or $68,227.29 more, despite the fact that during those years the Trustees made payments to those who attained age 65 or became totally disabled and to the estates of those who died. \* \* \*

"Between 1964 and 1967, the employer contributions totalled $1,581,492 while the growth in market values for the same period amounted to $5,289,353, or $3,707,-861 more, and this despite the fact that certain payments had to be made as in the previous period. \* \* \*

"In part this phenomenal growth in market values was due to the fact that the fund had invested part of its capital in the securities of Textron and these increased in market value from $689,886 in 1959 to $1,128,582 in 1963 and reached $6,225,000 in 1967. \* \* \*

"As has been explained, if an employee voluntarily terminates his employment, his account is frozen, that is, in accordance with Section 6.05 of the Plan, his account is not credited with any part of the employer's contribution nor is it increased by the amount of any forfeitures of accounts of other employees (as for example those whose employment is terminated for cause). Neither is his account increased or decreased by his proportion of any increases or decreases of the fund as a whole. Consequently insofar as increases in market values of the fund as a whole are concerned, these do not inure to the benefit of the employee whose employment has been terminated even though his account is still a part of the mingled funds which constitute the trust. Thus as of December 31, 1962 the vested balances of the Amerotron employees totalled $1,375,078.62. The whole market value of the entire fund, with which these vested balances were intermingled was $6,349,173. At the end of 1967, when the market value of the fund as a whole had increased to $14,322,451, the vested balances of the former Amerotron employees had not increased over what it had been on December 31, 1962.

"If those employees who have voluntarily terminated their employment do not benefit from the increases in market values, who then does benefit as the market value of the trust increases? The answer, in short, is those who are still employed by divisions of Textron and by its Corporate Office. As already explained, their number has been decreasing. In 1959, their number was 782, by 1963 their number had dropped to 448, while at the end of 1967 it was only 424.

present members of the Plan in the mingled fund. No doubt some displacement of funds will be required. However, defendants assert as a basis for denial of relief the very matter which is the subject of this litigation and which has now been resolved against them. Defendants cannot, in this court's opinion, claim displacement of funds which were never rightfully placed originally.

"Because of the provisions of the Plan, of the remaining employees, those with the largest salaries reap the greatest benefit. As a result, the lion's share of the increases directly benefit the executives in Textron's Corporate Office. * * *

As of December 31, 1962, just prior to the sale of Amerotron, the vested balances of the Corporate Office in the aggregate were $1,337,315.11. The following executives account for $1,084,452:

| Name | Position | Vested Balance |
| --- | --- | --- |
| Rupert C. Thompson, Jr.* | Chm. of Board | $ 207,951. |
| G. William Miller * | President | 65,984. |
| J. B. Collinson | V.Pres. and Treas. | 26,798. |
| J. Ottmar | V.Pres. | 30,569. |
| T. J. Riggs, Jr. | V.Pres. | 24,483. |
| Officers as Group | | 728,667. |
| | | $1,084,452. |

* Trustees and Defendants in this action.

"As of December 31, 1967, the vested balances of the Corporate Office in the aggregate were $4,328,877. The following executives account for $3,239,103:

| Name | Position | Vested Balance |
| --- | --- | --- |
| Rupert C. Thompson, Jr.* | Chm. of Board | $ 613,318. |
| G. William Miller * | Pres. | 261,528. |
| Officers as Group | | 2,364,257. |
| | | $3,239,103. |

* Trustees and Defendants in this action.

———◆———

"It is clear that a pattern emerges from these facts. By their decision to label the sale of Amerotron's assets in 1963 not a termination of the Plan as to the Amerotron employees under Article X but rather as a voluntary termination of their employment by these employees, the Defendant-Trustees have made available to the reamining employees of Textron's divisions and Corporate Office the benefit of the vested balances of the former Amerotron employees. Without having to pay for the privilege, these vested balances belonging to the former Amerotron employees were invested by the Defendant-Trustees and the income produced by these vested balances and the appreciation in value of these vested balances inured to the benefit of the remaining employees of Textron. Until 1967, the former Amerotron employees received absolutely no compensation for the use of their money. Only in 1967, after this action was commenced did the Defendants offer a modest interest payment as a concession and inducement to those former Amerotron employees who might be willing to surrender their rights in the present action.

"The Defendant-Trustees have never exercised their discretion to distribute vested amounts upon termination of employment where such amounts do not exceed $1,000. * * * This decision on their part further increased the funds available for the benefit of the executives in Textron's Corporate Office.

"Reduced to its bare essential outline, the former Amerotron employees in essence made an interest free loan to the Defendants so that the latter might invest the money and keep not only the income so generated but also the appreciation in value.

"Those who stood to gain the most from this arrangement were the executive employees in Textron's Corporate Office. With the exception of the two trustees who ceased to be trustees in December of 1963, the trustees were employees of Textron's Corporate Office. Their interpretation of the Plan clearly was of great benefit to them."

*Summary and Order*

It is the opinion of this court that the plan under consideration is basically a consensual arrangement and must be construed accordingly. In so construing, the court decides that the April 15, 1963 sale of Amerotron comes within the ambit of Article X as a termination of the Plan by way of a sale of an employer. In addition, the court reads section 10.02 as requiring a separation and valuation of the plaintiff class' interest in the mingled fund as of April 15, 1963. Section 10.02's reference to section 6.04 requires that the trustees of the fund segregated as of April 15, 1963 pay over the interest of the members of the plaintiff class to them upon death, total disability or attainment of age 60. Section 10.02's incompatibility with section 6.05's reference to mingled funds, together with section 10.02's conspicuous silence with respect to section 6.05, both require that the segregated fund should have been subject to increases between April 15, 1963 and the present and should be subject to increases or decreases in the future.

It is, therefore, hereby ordered (1) that defendants are permanently restrained and enjoined from distributing, delivering, allocating or crediting to any other person or account any funds to which the plaintiffs, and all other members of the class in whose behalf this action is brought, are entitled and shall further be permanently restrained and enjoined from doing anything in the administration of the Plan's corpus adverse to the interests of such persons; (2) that the aggregate amount of the interests of the plaintiffs and the class they represent are to be segregated by defendants and held and administered as a separate fund for the benefit solely of the members of the plaintiff class; (3) that the plaintiffs are awarded the expenses, costs and disbursements incident to the prosecution of this action, including reasonable counsel and accounting fees to their accountants and attorneys herein; and (4) that defendants are required to account to the plaintiffs and the class they represent with respect to the administration of the Plan's funds subsequent to April 15, 1963.

It is hereby further ordered that the previously ordered segregation, award of costs and fees, and accounting, but not the previously ordered injunctive relief, shall await the conclusion of appellate proceedings taken from the judgments entered herewith or the expiration of the time for taking an appeal herefrom, whichever shall last occur.

The plaintiffs' motion for summary judgment is granted. The previously ordered suspension of the cost and fees, segregation, and accounting aspects of the court's judgment shall not be construed to effect the finality of the court's grant of summary judgment.