NEW HAMPSHIRE INSURANCE
COMPANY Plaintiff,

v.

Nicholas DAGNONE Defendant,

v.

Hinckley Yacht Services (The Talaria
Company LLC) Third Party
Defendant

No. CA NO 04122ML.

United States District Court,
D. Rhode Island.

April 19, 2005.

 

Frederick A. Lovejoy, Providence, RI, for Plaintiff.

John D. Deacon, Providence, RI, for Defendant.

Norman A. Peloquin, II, Esq., Adamsville, RI, for Third Party Defendant.

### MEMORANDUM AND ORDER

LISI, District Judge.

This matter is before the Court on cross motions for summary judgment filed by Defendant Nicholas Dagnone ("Dagnone") and Plaintiff New Hampshire Insurance Company ("NHIC"), pursuant to Rule 56 of the Federal Rules of Civil Procedure. This case involves a dispute over whether a marine insurance policy issued by NHIC to Dagnone covers damage to his vessel and indemnifies him against potential property damage claims against the vessel. In its Motion for Summary Judgment, NHIC asks the Court to find that no coverage exists under the insurance policy for Dagnone's claim. NHIC asserts that Dagnone breached the terms of the policy by failing to have his vessel "laid up and out of commission" at the time the damage occurred, as the policy requires. Dagnone objects to NHIC's motion and, in his Motion for Summary Judgment, argues instead that his claims are covered. For the reasons stated below, Dagnone's motion is denied, and NHIC's motion is granted.

### I. FACTS

Dagnone, a resident of Carmel, New York, is the owner of a 1993 forty-nine foot Blue Water motorboat (the "vessel"). In September 1997, Dagnone, through his agent, Palmer Agency, Inc. ("Palmer Agency"), applied for a one-year marine insurance policy for the vessel from NHIC.

The Palmer Agency has an office in Carmel, New York. NHIC is a Pennsylvania corporation whose executive offices and underwriters are located in New York. NHIC issued Dagnone a maritime insurance policy, which Dagnone renewed on an annual basis.

On July 31, 2003, NHIC issued Dagnone Yacht Policy number YM 310–78–22 ("Yacht Policy"), which was effective from September 18, 2003 through September 18, 2004. The Yacht Policy provided coverage to the vessel, subject to a number of restrictions. These restrictions are enumerated in the "Restrictions Provision," which provides in pertinent part:

> 1. RESTRICTIONS ON THE USE OF YOUR YACHT: There are certain restrictions on the use of your yacht under this policy. We shall not cover losses that occur while your yacht is being used in any way that is prohibited by this policy.
>
> These are the restrictions:
>
> ·　　·　　·　　·　　·
>
> (d) Your yacht must be laid-up and out of commission during the period shown on the declarations.

(NHIC's Mem. Supp. Summ. J., Ex. 1.) The declarations page of the Yacht Policy contains a "Lay–Up Warranty": "Warranteed [sic] that the described yacht be laid up and out of commission and not used by the insured for any purpose during the period from 10/31 (at 12:01 am) to 04/15 (12:01 am)." (*Id.*) The Yacht Policy does not define the term "laid up and out of commission."

During the summer and fall of 2003, Dagnone docked the vessel at Goat Island Marina, located in Newport, Rhode Island.

For the winter of 2003–2004, he decided to store the vessel on land due to early season storms. Such storage on land is termed "dry storage," as opposed to "wet storage," which is storage in water. Dagnone hired Ted Beaumont ("Beaumont"), a licensed captain with twenty-five years experience in winterizing power boats, to winterize the vessel. Sometime in September or October 2003, Dagnone instructed Beaumont to winterize the vessel with the exception of its engines, as he expected that he would later need to navigate the vessel to a marina that offered dry storage.

In early November 2003, Dagnone made arrangements to dry store the vessel over the winter with Hinckley Yacht Services ("Hinckley"), in Portsmouth, Rhode Island. Dagnone and Beaumont agreed that Beaumont would navigate the vessel to Hinckley and winterize its engines once it was removed from the water. On November 22, 2003, Beaumont motored the vessel under its own power from Goat Island Marina to Hinckley. Beaumont docked the vessel on Hinckley's work dock and, with the assistance of Hinckley personnel, tied the vessel to the pier. From November 22, 2003 through December 6, 2003, the vessel remained afloat at the Hinckley work dock while it was awaiting outhaul.

On December 6, 2003, a storm was forecast to hit Rhode Island. In preparation for the storm, Hinckley employees moved the vessel from the work dock to a more protected dock in its facility. When the storm arrived on the night of December 6th, the vessel somehow became released from the dock and sustained damage after it apparently collided with another dock and two sailboats.[1]

---

1. The parties dispute the cause of the vessel's release from the dock. NHIC claims that the vessel became free because the lines tying the vessel to the Hinckley dock came undone, whereas Dagnone submits that the cleats to which the vessel was tied ruptured from the dock. This factual dispute, however, does not

Sometime later in the month of December, Hinckley removed the vessel from the water and stored it ashore. At that point, Beaumont completed winterizing the vessel by antifreezing the engine blocks.

Following the accident, Dagnone filed a claim with NHIC for the damage to the vessel, which totaled $38,327. He also filed a claim for the potential property damage claims arising from the accident. On February 4, 2004, NHIC issued a reservation of rights letter. On April 7, 2004, NHIC denied Dagnone's claim, asserting that Dagnone breached the Yacht Policy's Lay–Up Warranty by not having the vessel "laid up and out of commission" at the time of the accident.

NHIC filed this complaint on April 9, 2004, seeking a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that there is no insurance coverage in the Yacht Policy for Dagnone's claims. In answering the complaint, Dagnone asserted his own counterclaim that NHIC wrongfully and in bad faith refused to pay his claim. Dagnone also filed a third-party complaint against Hinckley on June 23, 2004, alleging breach of a maritime contract and maritime tort.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the pertinent evidence is such that a rational fact finder could render a verdict in favor of either party, and a fact is "material" if it "has the capacity to sway the outcome of the litigation under the

applicable law." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Cross motions for summary judgment "simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir.2004) (internal quotation marks and citation omitted).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. *Nat'l Amusements*, 43 F.3d at 735. Once the movant has made the requisite showing, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The Court views all facts and draws all reasonable inferences in a light that is most favorable to the nonmoving party. *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 6 (1st Cir.1997) (citation omitted). "When deciding cross motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." *Id.* at 6 (citation omitted).

## III. DISCUSSION

### A. Dagnone's Proposed Interpretation of the Yacht Policy

 Before addressing Dagnone's proposed interpretation of the Yacht Policy, the Court must first determine the appropriate law to apply when construing the provisions of the policy. The Yacht Policy is a marine insurance policy that falls under this Court's admiralty jurisdiction. *Windsor Mount Joy Mut. Ins. Co. v. Giragosian*, 57 F.3d 50, 54 (1st Cir.1995).

affect this Court's determination of the coverage question.

If no established federal admiralty rule governs the issues in a marine insurance dispute, then a court should apply state law rather than creating new federal law. *Id.* (internal citations omitted); *see also Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 320–21, 75 S.Ct. 368, 99 L.Ed. 337 (1955). Because the First Circuit has "found no federal statute or judicially-created rule governing the interpretation of maritime insurance policies, and conclud[ed] that [it] should not fashion any such rule," it directs courts to "look to the state law" when construing such policies. *Littlefield v. Acadia Ins. Co.*, 392 F.3d 1, 6 (1st Cir.2004).

Both parties appear to agree that New York law is the state law applicable to these proceedings, as the Yacht Policy was countersigned in New York, Dagnone resides in New York, and NHIC has offices in New York.[2] (*See* Def.'s Mem. Supp. Summ. J. at 10; Pl.'s Mem. Supp. Summ. J. at 7, 9–10.) Consequently, the Court will use New York law to interpret the Yacht Policy.

■ Dagnone first argues that the Yacht Policy restriction to coverage applies only if the vessel is not "laid up and out of commission" and it is also not "being used." This is because, Dagnone insists, the Restrictions Provision of the Yacht Policy "plainly and unambiguously provides that the consequence of any noncompliance with the lay-up requirement is that the Policy 'shall not cover losses that occur *while your yacht is being used*' in violation of the lay-up requirement." (Def.'s Mem.

Supp. Summ. J. at 2.) Even if the vessel was not "laid up and out of commission," Dagnone asserts that he did not breach the Lay–Up Warranty because the vessel was not being used at the time of the accident, and therefore the damage must be covered.

Under New York law, "[a]n ambiguity in the terms of an insurance contract will generally be construed liberally in favor of the insured. However, if the words are clear and unambiguous, they must be accorded their plain and ordinary meaning and the policy enforced as written...." *Francis v. INA Life Ins. Co. of New York*, 809 F.2d 183, 185 (2d Cir.1987) (citing New York case law). In addition, "a court must favor interpretations which give meaning and effect to every part of a contract and reject those which reduce words to mere surplusage." *Systemized of New England, Inc. v. SCM, Inc.*, 732 F.2d 1030, 1034 (1st Cir.1984) (applying New York law) (internal citations omitted).

The Restrictions Provision of the Yacht Policy states as follows:

1. RESTRICTIONS ON THE USE OF YOUR YACHT: There are certain restrictions on the use of your yacht under this policy. We shall not cover losses that occur while your yacht is being used in any way that is prohibited by this policy.

These are the restrictions:

. . . . .

---

2. NHIC explicitly states that New York law should be employed (Def.'s Mem. Supp. Summ. J. at 10), and Dagnone uses New York principles of contract interpretation in support of his construction of the Yacht Policy. (Pl.'s Mem. Supp. Summ. J. at 9–10.) Additionally, Dagnone, in his Memorandum in Opposition to NHIC's Motion for Summary Judgment, does not object to the application

of New York law. (*Id.*) In any event, the only other state whose law might arguably apply is Rhode Island, but since its sole connection to this litigation is that the vessel was docked in its waters at the time of the accident, it has no substantial interest in the application of its law. *See Albany Ins. Co. v. Wisniewski*, 579 F.Supp. 1004, 1013 (D.R.I.1984) (internal citations omitted).

(d) Your yacht must be laid-up and out of commission during the period shown on the declarations.

(NHIC's Mem. Supp. Summ. J., Ex. 1.) These provisions, read in their entirety, convey that NHIC will "not cover losses that occur while your yacht is being used in any way that is prohibited by this policy," with one such restriction being that the vessel "must be laid-up and out of commission during the period shown on the declarations." Dagnone's tortured interpretation of the Restrictions Provision seeks to isolate the first portion of the provision's second sentence while entirely ignoring the words that follow. This renders the Restrictions Provision to state that NHIC will "not cover losses that occur while your yacht is being used[,]" rather than stating, as it actually does, that NHIC will "not cover losses that occur while your yacht is being used in any way that is prohibited by this policy." Such an illogical construction violates the "familiar principle" of contract interpretation, cited by Dagnone himself, that a contract must be read to give meaning to every portion contained within. *Systemized of New England,* 732 F.2d at 1034.

The Yacht Policy plainly and unambiguously requires Dagnone to have his vessel "laid up and out of commission" from October 31, 2003 to April 15, 2004, the dates listed in the Lay–Up Warranty on the declarations page. The fact that the vessel was not "being used" at the time of the accident does not necessarily render Dagnone compliant with the Lay–Up Warranty.

*B. Dagnone's Compliance with the Lay–Up Warranty*

The Court now turns to the issue of Dagnone's compliance or noncompliance with the Lay–Up Warranty and its effect on the coverage offered by the Yacht Policy. Dagnone claims that the Yacht Policy covers all of the damage from the accident because the vessel was in conformance with the Lay–Up Warranty. NHIC instead argues that Dagnone was in breach of the Lay–Up Warranty at the time of the accident. According to NHIC, this breach invalidates the Yacht Policy because, under both federal admiralty law and New York law, a breach of a warranty in a marine insurance contract automatically releases the insurer from any liability under that contract.

■ The first issue presented by these arguments then is whether a breach of the Lay–Up Warranty negates coverage under the Yacht Policy even if that breach is immaterial to the damage sustained in the accident. To resolve this issue, the Court again must determine the applicable law.

As discussed *supra,* a court must apply settled federal admiralty rules to a marine insurance dispute. *Windsor Mount Joy Mut. Ins. Co.,* 57 F.3d at 54. In the absence of such settled rules, state law should be employed. *Id.*

Despite NHIC's contention that there is a *"specific* and *controlling* federal maritime rule concerning the effects of a warranties [sic] in marine insurance policies" such that "an insurer may invoke [a] warranty without proof of a causal relation between the breach of the warranty and the loss which occurred" (Def.'s Mem. Supp. Summ. J. at 8–9), this Court is not convinced that such a rule exists. To the contrary, in its 1955 decision *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* the Supreme Court held that no federal admiralty rule required "strict and literal performance" of warranties in marine insurance contracts. *Id.,* 348 U.S. at 319–21, 75 S.Ct. 368, 99 L.Ed. 337. Chief Judge Torres recently reiterated the *Wilburn Boat* holding in *Commercial Union Ins. Co. v. Pesante,* 359 F.Supp.2d 81, 82–83, 2005

WL 517743, at *2–3 (D.R.I. Mar. 3, 2005). In *Commercial Union Ins. Co.,* Chief Judge Torres found no current admiralty rule that "failure to literally comply with an express warranty in a marine insurance contract voids the contract even if the breach is not material to the loss." *Id.* at 82, 2005 WL 517743, *2. Where, as here, there is no settled federal admiralty rule governing the issue, this Court will again employ New York law.

■ Under section 3106(b) of New York's Insurance Law, a breach of warranty in an insurance policy generally "[does] not ... defeat recovery thereunder with respect to any kind or kinds of loss, damage or injury other than the kind or kinds to which such warranty relates and the risk of which is materially increased by the breach of such warranty." N.Y. Ins. L. § 3106(b). Section 3106(b), however, "[does] not affect the express or implied warranties under a contract of marine insurance in respect to, appertaining to or in connection with any and all risks or perils of navigation, transit, or transportation...." N.Y. Ins. L. § 3106(c). Therefore, under New York law, "where a warranty in a marine insurance policy pertains to any risk of marine navigation, transit or transportation on seas or inland waters, the breach of such warranty precludes recovery under such policy." *Advani Enterprises, Inc. v. Underwriters at Lloyds,* 962 F.Supp. 415, 419–20 (S.D.N.Y.1997) (internal quotation marks and citation omitted), *vacated on other grounds,* 140 F.3d 157 (2d Cir.1998); *see also Commercial Union Ins. Co. v. Flagship Marine Services, Inc.* 190 F.3d 26, 32 (2d Cir.1999) (finding that New York's Insurance Law requires strict compliance with warranties in maritime insurance contracts, even if they are collateral to the primary risk that is the subject of the contract); *Hartford Fire Ins. Co. v. Mitlof,* 208 F.Supp.2d 407, 412 (S.D.N.Y.

2002) (internal citation omitted) ("Under New York law, recovery under a marine insurance contract is precluded if a warranty is breached, regardless of its materiality to the insurer's risk."). The Lay–Up Warranty, which conditions coverage on the insured's promise not to navigate the vessel during the winter months, is a warranty in a marine insurance policy that pertains to a risk of navigation, transit or transportation. Consequently, New York law forecloses any coverage under the Yacht Policy if Dagnone was in breach of the Lay–Up Warranty at the time of the accident, irrespective of the relation between the breach and the damage.

■ Having determined that a breach of the Lay–Up Warranty releases NHIC from all liability under the Yacht Policy, the Court must now assess whether the vessel was "laid up and out of commission" when it was damaged. Dagnone contends that the vessel was indeed "laid up and out of commission" at the time of the accident, because it "was being held temporarily in wet storage, in the possession and control of a qualified and experienced marina, awaiting outhaul for dry storage[,]" because it "had been entirely winterized, excepting only the task of antifreezing the engine blocks, which was intended to be done after outhauling[,]" and because Hinckley "handled [it] in the same fashion as it handled all other vessels being held temporarily in wet storage awaiting outhaul for dry storage." (Def.'s Mem. Supp. Summ. J. at 14.) NHIC instead argues that the vessel was not "laid up and out of commission" on December 6, 2003 because it was not fully winterized as of that date. (Pl.'s Mem. Supp. Summ. J. at 10–11.)

■■ Nowhere in the Yacht Policy is the term "laid up and out of commission" defined. However, "[p]arties are presumed to contract with reference to general customs and usages which explain the

specific meaning of a term used and personal knowledge of the customary meaning need not be had by the parties to the contract." *Gelb v. Automobile Ins. Co. of Hartford, Conn.*, 168 F.2d 774, 775 (2d Cir.1948) (applying New York law). Accordingly, when required to interpret the meaning of the term "laid up and out of commission," other courts have looked to the local custom of laying up similar vessels to guide their decisions. *See, e.g., Providence Washington Ins. Co. v. Lovett,* 119 F.Supp. 371, 373–74 (D.R.I.1953); *Goodman v. Fireman's Fund Ins. Co.*, 600 F.2d 1040, 1042–43 (4th Cir.1979); *Gelb,* 168 F.2d at 775; *Wigle v. Aetna Cas. & Sur. Co.*, 177 F.Supp. 932, 934 (E.D.Mich. 1959). This Court will do the same.

In determining the local custom of laying up boats similar to Dagnone's vessel, both Dagnone and NHIC point to this Court's 1953 decision in *Providence Washington Ins. Co. v. Lovett,* 119 F.Supp. at 373–74. In *Providence Washington Ins. Co.*, the issue presented was whether a forty-foot motorboat was "laid up and out of commission" at Port Edgewood Marina in Rhode Island at the time that it was damaged in a winter storm. The Court found:

> [I]t was the well-established practice and custom at Port Edgewood Marina, depending on the factors herein stated either (1) to haul boats up on shore prior to November 1, if possible, and then winterize them on land, or (2), if such action was not possible by November 1, then to place such boats, completely winterized, in slips on either side of the piers in wet storage for a reasonable length of time pending hauling ashore, and in no circumstances later than the fifteenth day of December.

*Id.* at 374. The Court also noted that the practice and custom of laying up motorboats varied from location to location in Narragansett Bay, and found that boats similar to the one in question "were not customarily wet stored at Port Edgewood Marina for the entire winter season [but] were moored in the water out of service for the entire winter season at certain other specified locations in the Narragansett Bay area." *Id.* at 374.

While the parties argue that *Providence Washington Ins. Co.* governs the case that is currently before the Court, they overlook the factual differences that distinguish that controversy from this one, making it of limited applicability here. First, in *Providence Washington Ins. Co.*, the Court expressly limited its determination of the custom of laying up motorboats to the custom at Port Edgewood Marina, because that custom differed from the custom of other marinas in Rhode Island. Second, *Providence Washington Ins. Co.* was decided in 1953. What was the custom at Port Edgewood Marina more than fifty years ago may have since changed. Consequently, the custom and practice for laying up motorboats that was decided in *Providence Washington Ins. Co.* is not necessarily the current custom and practice at Hinckley.

While no case since *Providence Washington Ins. Co.* has revisited the custom and practice of laying up motorboats in Rhode Island, it is undisputed that the current custom continues to require that the engines of the vessel in question be winterized. James Kerr, the manager of Hinckley, testified at deposition that Hinckley's outhauling process for winter storage includes the winterization of a vessel's engines. (Def.'s Mem. Supp. Summ. J., Ex. 8 at 63–66.) Beaumont, the captain that Dagnone hired to winterize his vessel, also testified that a vessel like Dagnone's needed to be winterized in order to survive the winter months. (Def.'s Mem. Supp. Summ. J., Ex. 7 at 59–60, 63–64.) Beau-

mont testified that this process included running antifreeze through the vessel's engines. (*Id.* at 63–64.) Even Dagnone admits that his vessel is "laid up and out of commission" only if its engines are winterized. NHIC, in an interrogatory, asked Dagnone what he had done to his vessel in order to comply with the Lay–Up Warranty in the years prior to 2003. In response, Dagnone replied: "In the winter of 2002–2003, the boat stayed moored in wet storage at Goat Island. In the early fall of 2002, Ted Beaumont winterized the water systems, the generator, and the engines. This is all the winterizing the boat requires." (Def.'s Mem. Supp. Summ. J., Ex. 6 at 3.)

Because Dagnone had not completed winterization of the vessel at the time of the accident, the vessel was not "laid up and out of commission" as required by the Yacht Policy. Dagnone's breach of the Lay–Up Warranty precludes recovery under the policy. Accordingly, Dagnone's Motion for Summary Judgment is DENIED and NHIC's Motion for Summary Judgment is GRANTED.

SO ORDERED.