**WINDSOR MOUNT JOY MUTUAL INSURANCE COMPANY, Plaintiff–Appellant,**

v.

**John GIRAGOSIAN and Deborah Giragosian, Defendants– Appellees.**

No. 94–1764.

United States Court of Appeals, First Circuit.

Heard Dec. 5, 1994.

Decided June 16, 1995.

Michael J. Calabro, with whom Flanagan & Hunter, P.C., was on brief, for appellant.

Thomas M. Neville, with whom Segalini & Neville, was on brief, for appellees.

Before TORRUELLA, Chief Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

TORRUELLA, Chief Judge.

Windsor Mount Joy Mutual Insurance Company ("Windsor") sought a declaration from the district court of its rights and obligations with respect to an insurance policy held by John and Deborah Giragosian for their 34–foot sailboat *Escape,* which had sunk in Boston Harbor. The Giragosians counterclaimed for contract damages due to Windsor's allegedly improper failure to honor the policy.[1] After a bench trial, the district court determined that Windsor had a contractual duty to indemnify the Giragosians in the stipulated loss amount of $58,000. Windsor now appeals this ruling. For the following reasons, we affirm.

## BACKGROUND

In 1989, the Giragosians purchased the *Escape,* a 1987 model 34–foot Catalina sailboat with a 12–horsepower diesel auxiliary. The Giragosians insured the *Escape* with Windsor under a fairly standard marine in-

---

1. The Giragosians also counterclaimed for violations of Mass.Gen.L. chapters 93A and 176D, prohibiting unfair and deceptive practices in the business of insurance. The district court ruled that Windsor did not commit any unfair or deceptive trade practices, and the Giragosians do not appeal this decision.

surance policy which contained the following warranty of seaworthiness:

> Seaworthiness Warranty. Warranted that at the inception of this Policy the vessel shall be in a seaworthy condition and, thereafter, during the term of this Policy, the Assured shall exercise due diligence to maintain the boat in a seaworthy condition.

In the months before the *Escape* was lost, Mr. Giragosian's adverse experiences relating to the vessel were limited to the following: During one excursion, Giragosian ran the vessel aground, and called for help using his radio. Occasionally, the diesel engine stalled. In August of 1991, the engine stalled as Giragosian was entering Scituate Harbor after a pleasure cruise. He was unable to restart the engine, and thus obtained permission to moor the vessel in Scituate Harbor. Most significantly, on October 19, 1991, someone noticed that the *Escape* was lying very low in the water and the Coast Guard was called to pump the boat out. The Coast Guard pumped out the vessel and promptly informed the Giragosians of the situation.

Giragosian went to Scituate Harbor on October 24, 1991, accompanied by his friend Daniel Likely. The two planned to sail the *Escape* to the Bay Point Marina in Quincy to have it hauled for the season. Giragosian and Likely rowed to where the *Escape* was moored. Once on board, however, they realized that the locks to her cockpit had been changed by the Coast Guard personnel who had pumped the boat out five days earlier. Giragosian came ashore and retrieved the key from the Coast Guard station. At the station, Giragosian had a conversation with Coast Guard officials, who suggested that perhaps the water had gotten into the vessel's bilges by running down the mast, *i.e.*, that it was rainwater.

After retrieving the key from the Coast Guard, Giragosian and Likely returned to the *Escape*, boarded the boat, and prepared to cast off. Before the *Escape* left Scituate Harbor, Giragosian looked into the bilge and noticed one to two inches of water. He considered this to be normal. He also noticed water stains indicating that there had

been about six inches of water in the bilges at one time.

Giragosian unsuccessfully attempted to start the vessel's diesel engine. Because the batteries were low, Giragosian turned off the radio, but kept the depthfinder on throughout most of the voyage. Because he intended to operate by "dead reckoning" from Scituate Harbor to the Bay Point Marina, Giragosian did not think that he needed the electronic equipment. He also decided to make the trip solely under sail, as the winds were light, the day clear, and the sea calm.

At about 3:00 p.m., Giragosian headed the *Escape* out of Scituate Harbor under sail, towing a small inflatable dingy behind. He sailed northeast out of Scituate Harbor, navigating by compass and dead reckoning. He estimated that he was sailing at about six knots. At around 4:30 p.m., his depthfinder failed. Later, between 5:00 and 6:00 p.m. and well out in greater Boston Harbor, Giragosian noticed that his floorboards were now covered with sloshing water and that they had begun to float. He checked the bilges and found that they contained about four feet of water, so he and Likely attempted to pump the water out manually. At this point, the *Escape* still had sufficient power to operate the navigation lights, but only dimly. Giragosian tried to go below to get a flashlight, but could not find one as the water was now flooding the cockpit and the flashlight was underwater. He tried to use his radio to call for help, but could raise no one.

It was getting close to sunset, and the sea had become slightly choppy. Giragosian and Likely donned life preservers, retrieved the flare gun, dropped the sails, and hooked up the outboard motor to the inflatable dinghy. They abandoned the *Escape* and started toward a drilling rig light some distance away in the harbor. Their dinghy engine ran out of gas, so it took them two hours to paddle by hand to the rig, where they were rescued after some time by the Coast Guard. Neither Giragosian nor Likely saw the *Escape* go down. The Coast Guard searched for the vessel but was unable to find any sign of it.

The Giragosians gave proper notice to Windsor. Windsor conducted its own search for the vessel with underwater detection de-

vices. This search, however, proved futile, and the *Escape* was never seen again. Windsor eventually denied Giragosian's claim.

The district court found, based on the totality of the facts and circumstances presented during trial, that the water pumped out of the hold of the vessel by the Coast Guard had not actually come down the mast, but rather was the result of a leak in the hull, a defect which was aggravated by Giragosian's attempts to sail the boat. The court went on to find, however, that Giragosian was not actually aware that the vessel was leaking at or below the waterline, and he did not know or appreciate that sailing the vessel was aggravating the leak.

The district court found that the *Escape* was in a seaworthy condition at the commencement of the policy's coverage, and that the Giragosians exercised due diligence to maintain the boat in this condition. The court went on to find that the *Escape* was, however, unseaworthy on October 24, 1991 when Giragosian and Likely sailed her out into open waters. The court specifically found, however, that Giragosian did not know of the boat's unseaworthy condition, and that the condition was not caused by any lack of due diligence on Giragosian's part.

The court nevertheless ruled as a matter of law that Giragosian was negligent in taking the *Escape* out to sea on October 24, 1991. According to the court, the "objective combination of the facts"—that he knew that his boat had been low in the water and had been pumped out by the Coast Guard, and that he was aware that he had no auxiliary power and that his batteries were low—rendered Giragosian's decision to sail the *Escape* negligent. Yet this negligence, the court explained, did not necessarily preclude coverage under the insurance policy. Despite his negligence, the court concluded, Giragosian had not failed to exercise due diligence in maintaining the boat's seaworthiness, and therefore he is entitled to indemnification from Windsor under the policy. Windsor now appeals.

## STANDARD OF REVIEW

Our standard for reviewing a district court's findings of fact and conclusions of law made in conjunction with a bench trial is well settled. We review claimed errors of law *de novo*. *Williams v. Poulos,* 11 F.3d 271, 278 (1st Cir.1993); *Blanchard v. Peerless Ins. Co.,* 958 F.2d 483, 487 (1st Cir.1992). The district court's findings of fact, however, will not be set aside unless they are demonstrated to be clearly erroneous. *Williams,* 11 F.3d at 278; Fed.R.Civ.P. 52(a). In other words, we will give such findings effect unless, after carefully reading the record and according due deference to the trial court, we form "a strong, unyielding belief that a mistake has been made." *Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 152 (1st Cir.1990). Where there are two permissible views of the evidence, the interpretation assigned by the trial court will therefore be adopted. *Williams,* 11 F.3d at 278.

"The clearly erroneous standard also ordinarily applies to our review of a district court's resolution of mixed questions of law and fact. In such situations, however, we are obligated to determine whether the court's decision was infected by legal error. And if a trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Id.* (internal quotations omitted).

## ANALYSIS

Windsor appeals the district court's decision on several grounds. First, Windsor contends that the court applied an incorrect legal standard both to the interpretation of the warranty of seaworthiness in the marine insurance policy, and to the warranty's "due diligence" requirement. Windsor also argues that certain factual findings of the district court are inconsistent, and that as a matter of law, the terms of the insurance policy preclude coverage for loss due to a "latent defect." We address these arguments in turn.

A. *Did the district court apply the appropriate legal standard for interpreting the warranty of seaworthiness?*

In interpreting the marine insurance policy, particularly the warranty of seaworthi-

ness, the district court applied principles of Massachusetts insurance law rather than the maritime doctrine, applicable in marine insurance cases, of *uberrimae fidei.*[2] Citing *Wilburn Boat Co. v. Fireman's Fund Ins. Co.,* 348 U.S. 310, 320–21, 75 S.Ct. 368, 373–74, 99 L.Ed. 337 (1955), the court explained that "regarding matters of insurance, ... the doctrine of *uberrimae fidei* gives way to the state's ... interests in regulating the relationship between insurer and insured." Appellant Windsor now argues that this choice of law ruling was erroneous.

The propriety of maritime jurisdiction over a suit involving a marine insurance policy is unquestionable. *Albany Ins. Co. v. Wisniewski,* 579 F.Supp. 1004, 1013 (D.R.I. 1984) (citing *Kossick v. United Fruit Co.,* 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961); *Wilburn Boat,* 348 U.S. at 313, 75 S.Ct. at 370). When, however, no established maritime rule governs the issues of a marine insurance dispute, the *Wilburn Boat* inquiry becomes applicable. In the absence of a settled federal maritime rule, *Wilburn Boat* has generally been interpreted, "in deference to state hegemony over insurance, to discourage the fashioning of new federal law and to favor the application of state law." *Albany Ins. Co.,* 579 F.Supp. at 1013–14 (listing cases). Where, on the other hand, a settled maritime rule directly governs the litigation, that rule controls. *See Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d 293, 305–06 (2d Cir.1987), *cert. denied sub nom. J.E. Bernard & Co. v. Ingersoll Milling Mach. Co.,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988). State law may supplement maritime law when maritime law is silent or a local matter is at issue, but state law may not be applied where it is materially different from maritime law, or where it would defeat

the reasonably settled expectations of maritime actors. *See Albany Ins. Co. v. Anh Thi Kieu,* 927 F.2d 882, 887 (5th Cir.1991); *Floyd v. Lykes Bros. S.S. Co., Inc.,* 844 F.2d 1044 (3d Cir.1988); *Coastal Iron Works, Inc. v. Petty Ray Geophysical, Div. of Geosource, Inc.,* 783 F.2d 577 (5th Cir.1986); *Steelmet, Inc. v. Caribe Towing Corp.,* 747 F.2d 689, 695 (11th Cir.1984); *Fireman's Fund Am. Ins. Co. v. Boston Harbor Marina, Inc.,* 406 F.2d 917, 919 (1st Cir.1969); *cf. Pace v. Insurance Co. of No. Am.,* 838 F.2d 572 (1st Cir.1988) (holding that the admiralty clause of the U.S. Constitution did not necessarily bar a state law claim against a maritime insurer for its bad faith refusal to honor a claim).

Given these choice-of-law principles, the narrower issue is whether an established rule of maritime law is applicable to the dispute at bar. If a maritime rule controls the disputed issue, *and* that rule is materially different from state law, then the district court's decision to abandon maritime law was legal error. Windsor argues that the doctrine of *uberrimae fidei*[3] is directly applicable here, and that the district court should have employed this doctrine rather than Massachusetts insurance law in formulating its conclusions.

We need not undertake this analysis, however, because we find that the stringent *uberrimae fidei* doctrine does not relieve Windsor of its liability to the Giragosians under the policy. True, the doctrine requires the parties to a marine insurance policy to accord one another the highest degree of good faith. *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 13 (2d Cir.1986). In particular, the doctrine imposes a strict duty on the insured to disclose to the insurer all known

---

**2.** "The most perfect good faith." Black's Law Dictionary 1363 (5th ed. 1979).

**3.** The doctrine traditionally applied to insurance law in general. *See Stipcich v. Metropolitan Life Ins. Co.,* 277 U.S. 311, 316, 48 S.Ct. 512, 513, 72 L.Ed. 895 (1928) ("Insurance policies are traditionally contracts *uberrimae fidei* and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option."). Insurance law is primarily a matter of state concern, however, and over the years most states, including

Massachusetts, have abandoned the strict *uberrimae fidei* doctrine for insurance policies generally. *See Anh Thi Kieu,* 927 F.2d at 888 (tracing history of doctrine). Today, virtually the sole remaining vestige of the doctrine is in maritime insurance law. *Id.* Even then, however, it is debatable whether the doctrine can still be deemed an "entrenched" rule of law. *Id.* at 889–90 (discussing marine insurance cases in which courts refused to apply doctrine in its strictest form).

circumstances that materially affect the insurer's risk, the default of which duty renders the insurance contract voidable by the insurer. *Id.* Once policy coverage has commenced, the doctrine imposes an equally strict, continuing obligation on the vessel owner to ensure that the vessel will not, through either bad faith or neglect, *knowingly* be permitted to break ground in an unseaworthy condition. *Austin v. Servac Shipping Line,* 794 F.2d 941 (5th Cir.1986) (citations omitted) (emphasis added).[4] The doctrine has long been considered to be one of limited applicability, however, in light of the Supreme Court's *Wilburn Boat* decision, *see* 348 U.S. at 316–317 (explaining limitations of doctrine in marine insurance contract context). Whatever the exact extent of the applicability of the strict *uberrimae fidei* standard, we cannot believe that in these times it requires a pleasure boat owner to notify the insurer every time the craft takes on a small amount of water, or has engine trouble, at pain of losing coverage.

As the district court specifically found, the *Escape* was indeed unseaworthy when Giragosian set sail, but he did not know of its unseaworthy condition, and the condition was not the result of his neglect or lack of due diligence. Windsor does not challenge these factual findings, but instead argues that Giragosian failed to exercise due diligence in ascertaining the vessel's condition before setting sail on August 24, 1991. We disagree. Although the Coast Guard had recently pumped her out, the officials told Giragosian that the water had probably run down the mast, and Giragosian was certainly reasonable in accepting their opinion. Windsor claims that Giragosian should have consulted a marine mechanic in Scituate. As a matter

of law, however, we do not think that the doctrine of *uberrimae fidei* requires boat owners to hire mechanics, at the risk of losing their insurance coverage, every time a boat takes on small amounts of water. As any boat owner knows, most boats leak at some time. Moreover, a full five days after the Coast Guard had pumped water out of the vessel, Giragosian found only one to two inches of water in the bilges—a normal amount for the *Escape*—and the water was easily pumped out.[5] These circumstances simply do not support a conclusion that the district court committed clear error in finding Giragosian duly diligent in maintaining and ascertaining the seaworthiness of the *Escape* before setting sail on August 24, 1991. We therefore affirm the district court's determination that Giragosian did not breach the warranty of seaworthiness of the insurance policy.[6]

**B. Were the district court's factual findings inconsistent?**

Windsor also claims that the district court's factual finding that the sinking of the *Escape* was due to a "latent defect" is inconsistent with its alleged finding that the Giragosians were "on notice" of the boat's condition. In support of this argument, Windsor claims that "latent defect" is a term of art meaning a flaw which is not discoverable through inspection by a reasonably skilled person. Because Giragosian was "on notice" of the vessel's condition, Windsor argues, the *Escape*'s defect could not have been latent, and Giragosian lacked due diligence in finding it.

As the Giragosians correctly point out, however, nothing in the district court's find-

---

4. Although strict, this continuing obligation is not "absolute," contrary to Windsor's assertions.

5. We agree with the Giragosians that the case of *Prado, Inc. v. Lexington Ins. Co.,* 1990 WL 255535, *8 (D.Mass.1990), *aff'd,* 930 F.2d 906 (1st Cir.1991), is entirely distinguishable. In that case, although their vessel had been leaking considerably for an extended period of time, the insureds made absolutely no attempt to ascertain the source of the highly unusual amount of water in the vessel, and did not consult with either

Coast Guard personnel or mechanics. These facts are not present here.

6. Our conclusion is unaffected by the district court's determination that Giragosian was negligent for setting sail in the *Escape* that day because he had no auxiliary power and a low radio battery. For as the district court also correctly held, his decision to set sail, negligent or not, is simply irrelevant to whether he was in breach of the insurance policy's warranty of seaworthiness.

ings even suggest that Giragosian was "on notice" of the boat's defect; to the contrary, the court specifically found that Giragosian did *not* know of it. Based on the evidence, we see no inconsistency, much less clear error, in the court's factual findings. Furthermore, when read in context, it is clear that the district court did not employ the term "latent defect" as a term of art, but merely in the ordinary, common-sense meaning of the phrase—*i.e.*, an unknown or unsuspected flaw. Essentially, Windsor's argument here is a reiteration of their previous contention that Giragosian should have located the source of the water in the bilges, and that his failure to do so constitutes lack of due diligence. As we explained above, however, the district court's determination that Giragosian was duly diligent was not clear error. Accordingly, we affirm the district court's findings and reject Windsor's contention on this point.[7]

### CONCLUSION

For the foregoing reasons, we *affirm* the judgment of the district court.

---

**7.** Windsor also argues that accepting the district court's finding that the leak in the *Escape*'s hull was a "latent defect," the policy does not provide coverage for the boat's loss. In support of this contention, Windsor points to two paragraphs in the policy. The first paragraph states that the policy provides coverage for any physical loss or damage from "any external cause." The second paragraph specifically excludes from coverage "loss, damage or expense arising from or in consequence of . . . the repair or replacement of a part in which a latent defect has been found, mechanical breakdown or faulty manufac-

ture. . . ." Under the language of these clauses, Windsor contends, coverage should have been denied.

Windsor raises these arguments now for the first time, never having presented any evidence nor, as far as the record shows, even discussed these clauses before the district court. Because Windsor most certainly could have raised these arguments below and gives no explanation for its failure to do so, we deem the arguments waived. *Havinga v. Crowley Towing & Trans. Co.*, 24 F.3d 1480, 1483 (1st Cir.1994); *FDIC v. Caporale*, 931 F.2d 1, 2 (1st Cir.1991).