# United States Court of Appeals
## For the First Circuit

Nos. 02-1590
     02-1591

KENTH PERSSON and HARTMUT RATHJE,
Plaintiffs, Appellants/Cross-Appellees,

and

ROLF SJÖSTRÖM,
Plaintiff, Cross-Appellee,

v.

SCOTIA PRINCE CRUISES, LTD.
f/n/a PRINCE OF FUNDY CRUISES, LTD.,
Defendant, Appellee/Cross-Appellant.

------------

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. David M. Cohen, U.S. Magistrate Judge]

------------

Before

Torruella, Lynch and Howard,
Circuit Judges.

------------

    Michael X. Savasuk, on brief, for plaintiffs/appellants/cross-
appellees.
    Leonard W. Langer, with whom Marshall J. Tinkle and Tompkins,
Clough, Hirshon & Langer, P.A., were on brief, for
defendant/appellee/cross-appellant.

------------

May 27, 2003

------------

**TORRUELLA**, <u>Circuit Judge</u>.  Hartmut Rathje, Kenth Persson, and Rolf Sjöström, (collectively, the "Officers") were the captain, chief engineer, and chief engineer/consulting superintendent, respectively, of the M/S SCOTIA PRINCE.  The SCOTIA PRINCE is a cargo and passenger ferry operated by Scotia Prince Cruises, Ltd. ("SPC") between Portland, Maine and Yarmouth, Nova Scotia. Claiming they were fired in April 2001, the Officers brought suit under the federal court's admiralty jurisdiction against SPC for breach of their employment contracts.  SPC raised as a defense that the Officers had resigned and counterclaimed, alleging that the Officers had breached a fiduciary duty by failing to maintain the vessel.

A bench trial was held by consent before a magistrate judge, who held that (a) Rathje and Persson resigned without giving prior notice pursuant to their employment contracts and therefore were not entitled to wages following their departure from the vessel; (b) SPC terminated Sjöström's employment as consulting superintendent (though not as chief engineer) without permitting him to work his "notice period" of nine months and therefore owed Sjöström nine months of superintendent pay; and (c) the Officers were not liable to SPC for any negligent maintenance of the vessel. All issues are appealed: Rathje and Persson appeal the decision that they are not entitled to wages and vacation pay; SPC appeals the decision that it is liable to Sjöström for damages and that its

former employees are not liable for damage to the ship.  After reviewing the record, we affirm.

## I.  Background Facts

We recount only the facts relevant to our decision; a more complete description of the facts can be found in the district court's opinion.  See Rathje v. Scotia Prince Cruises, Ltd., No. 01-123-P-DMC, 2002 U.S. Dist. LEXIS 4078, at *5-38 (D. Me. Mar. 13, 2002).

The Officers began working aboard the M/S SCOTIA PRINCE in the late 1980s.  Each Officer had an employment contract with Prince of Fundy Cruises, Ltd. ("POF"), SPC's predecessor.  Notice time for termination under Rathje's employment contract was three months; under Persson's contract, sixty days notice was required.  Sjöström's contract stated: "[Nine] months notice of termination required by both parties."  Sjöström worked in Sweden; POF contracted first with the Swedish company Marine Trading and then with Plus 2 Ferryconsultation AB ("Plus 2") to pay Sjöström's salary in Swedish kronas.

At the beginning of the 2001 season, SPC's Chairman, Matthew Hudson, met with the Officers and advised them that he was contemplating the engagement of International Shipping Partners, Inc. ("ISP"), a manning/purchasing contractor.  Although several top managers had been fired, Hudson assured the Officers that this

would not affect their contracts, which were "ring-fenced."[1] Hudson also stated that the employees who had been terminated would receive a severance package of one week's pay for each year of service with the company.

Hudson engaged ISP the next morning, April 5, 2001, to take over the complete management of the vessel. ISP met with the Officers and presented a budget showing Rathje and Persson to be receiving significantly less compensation than provided in their current contracts, and Sjöström to be receiving no compensation at all as superintendent (because ISP assumed those duties). The Officers were upset, and the meeting ended with the Officers telling ISP, "Basically it's either you or us."

Over the course of the next few days, several email messages and facsimiles were sent between the Officers and Hudson. In their first message, the Officers wrote:

> As it stand[s] now, we see only two options. We stick to the agreement you presented last night, i.e. ISP serves as a manning agency only and the current contracts and conditions are maintained, possible new conditions only applying to new hires. Alternatively, if ISP takes over both complete manning and technical management, we ([Rathje and Persson]) accept the standard severance package (one week for every year of service) and [Sjöström] gives the 9-month notice in accordance with his contract.

---

[1] The parties understood this to mean that the contracts were locked-in and would not be altered.

When Hudson responded that their contracts were "ring-fenced," the Officers asked Hudson to focus on the statement beginning "As it stands now . . . " so they could "concentrate on [their] jobs or go home." In response, Hudson stated, "I consider that the [Officers] have effectively resigned and I accept those resignations on behalf of [SPC]."

The Officers' last day was April 20; Rathje and Persson acknowledge payment in full up to that date and Sjöström acknowledges payment in full to April 30. They filed this lawsuit seeking payment for the termination periods provided for in their contracts.

After the Officers were replaced, SPC discovered various problems with the upkeep of the ship including damage to the wood. SPC alleged that the Officers were responsible, and cross-claimed for more than one million dollars. The bench trial was held on February 11-15, 2002, and a decision was issued on March 13, 2002. This appeal followed.

## II.  Standard of Review

We review the district court's legal conclusions de novo. Watson v. Deaconess Waltham Hosp., 298 F.3d 102, 108 (1st Cir. 2002). We review factual determinations for clear error. Fed. R. Civ. P. 52(a) (2003). Our job is to determine whether the decision below is reasonable in light of the entire record. See Portland Natural Gas Transmission Sys. v. 19.2 Acres of Land, 318 F.3d 279,

-5-

281 (1st Cir. 2003). We give great respect to the district court's "opportunity to hear the testimony, observe the witnesses' demeanor, and evaluate the facts at first hand," United States v. Nee, 261 F.3d 79, 84 (1st Cir. 2001) (internal quotation omitted), and defer to the trial court's findings unless "we form a strong, unyielding belief that a mistake has been made." Windsor Mount Joy Mut. Ins. Co. v. Giragosian, 57 F.3d 50, 53 (1st Cir. 1995) (internal quotation omitted). Even then, we may affirm the judgment on any grounds revealed by the record. United States v. Puerto Rico, 287 F.3d 212, 218 (1st Cir. 2002).

## III. Discussion

We have jurisdiction over this dispute, which arises out of employment contracts aboard a vessel. See U.S. Const. Art. III, § 2; 28 U.S.C. § 1333(2003); 7A J.W. Moore, Moore's Federal Practice § 0.225, at 2701, § 0.230, at 2783 (2d ed. 1996) (hereinafter Moore's Federal Practice). The Federal Rules of Civil Procedure apply to admiralty cases. Fed. R. Civ. P. 1 (2003). The substantive matter is governed, in hierarchical order, by federal statutes and treaties, general maritime law developed by the Supreme Court, state statutes, and finally common law decisions of the state courts. 1A Moore's Federal Practice § 0.326, at 3233-35. "State law may supplement maritime law where maritime law is silent . . ., but state law may not be applied where it is materially different than maritime law, or where it would defeat the

-6-

reasonably settled expectations of maritime actors." <u>Windsor Mount Joy Mut. Ins. Co.</u> v. <u>Giragosian</u>, 57 F.3d 50, 54 (1st Cir. 1995).

## A. **Rathje and Persson**

Rathje and Persson appeal from the district court's determination that they resigned and were therefore not entitled to termination pay under their employment contracts. They attack several findings of fact made by the district court, asserting that it was clear error for the court to find that neither Officer (1) could have reasonably believed he was being terminated, (2) could have reasonably believed that he was entitled to severance pay that was not mentioned in his contract, (3) could have reasonably believed that he was relieved from his obligation to give notice to SPC before quitting, and (4) was entitled to termination pay. We find that the district court's findings are not clearly erroneous.

First, the record shows that Rathje and Persson wrote to Hudson, acknowledging that they were "fenced-in and protected, meaning that nobody could touch our contracts." Their claim that Hudson effectively terminated them by contracting with ISP (whose numbers showed their pay reduced by thirty percent) thus fails because the Officers understood that their contracts were unalterable. The Officers never sought clarification from Hudson, the chairman, about ISP's new role, and Hudson never told the Officers anything to suggest that their contracts were not protected.

-7-

As evidence of their mindset at the time and support for their belief that they, too, were being terminated, Rathje and Persson point to the fact that several other long-time employees were fired by Hudson. This is not persuasive, however, because none of the other employees were fired by email message, and Hudson had reassured Rathje and Persson both orally and in writing that their contracts were secure. The record shows that the Officers were treated differently than other employees. It was therefore not clearly erroneous for the district court to find that Rathje and Persson could not reasonably believe that they were implicitly terminated by email message.

Second, while Hudson mentioned to Rathje and Persson that it would be good for them to "know about" a severance plan for employees, he did not specifically state that it applied to them. Each officer had a written contract stating "I cannot claim any additional benefits or wages of any kind (except) those which have been provided in this contract." It was therefore not clear error for the district court to find that Rathje and Persson could not have reasonably believed that they were entitled to a newly-introduced extrinsic severance package.

Third, it was not clear error for the district court to find that Rathje and Persson's belief that they did not have to give notice because Hudson offered to pay them "ex gratia" was irrelevant to the breach of employment contract. The court found

that any offer by Hudson (discussed in greater detail in Part (III)(C), below) was made <u>after</u> the Officers resigned; therefore, it was too late for Rathje or Persson to give notice in order to comply with his employment contract. It is irrelevant whether the Officers no longer believed they had to give notice -- they were no longer entitled to give notice.

Finally, it was not clearly erroneous for the court to determine that Rathje and Persson were not entitled to termination pay because they were unwilling to work their notice period. The record shows that Rathje and Persson presented an ultimatum to Hudson -- that he either cancel his (binding) contract with ISP or the Officers would leave the ship. It was plausible for the court to find that Rathje and Persson were threatening to quit immediately and not simply giving notice of their resignations.

To summarize, we affirm the district court's factual determinations that Rathje and Persson resigned without giving notice and are therefore not entitled to damages because the findings are plausible in light of the evidence.[2] <u>CEH, Inc.</u> v. <u>F/V Seafarer</u>, 70 F.3d 694, 698 (1st Cir. 1995).

---

[2] Because we affirm the district court's determination that Persson is not entitled to damages, we need not decide whether he is a seaman entitled to double wages. <u>See</u> 46 U.S.C. § 10313(g) (2003).

**B.  Sjöström**

SPC challenges the district court's ruling that it is liable to Sjöström for nine months termination pay in his position as consulting superintendent.  The district court found that Sjöström's position as consulting superintendent was eliminated as soon as Hudson contracted with ISP, thereby prohibiting Sjöström from working his notice period.

SPC first claims that Sjöström was not its employee but was employed by Plus 2.  Testimony supports the district court's determination that, while Plus 2 handled the administrative aspects of Sjöström's employment via a contract with SPC (to the benefit of both Sjöström and SPC), the terms of Sjöström's employment continued to be dictated by his original contract with SPC's predecessor, which was renewed annually by the course of dealing of the parties.  Sjöström was not a party to the contract between Plus 2 and SPC, and that contract did not supersede his employment contract with POF (which was later assumed by SPC).  We find nothing clearly erroneous in the finding that Sjöström was an employee of SPC.

SPC also asserts that it was entitled to fire Sjöström because he had disregarded orders to cease making purchases through Marine Trading.  While SPC did argue that Sjöström had breached his contract by negligently maintaining the SCOTIA PRINCE, it never before argued that Sjöström was in breach by dealing with Marine

Trading.  This argument was not raised below and is therefore waived.  Brigham v. Sun Life of Can., 317 F.3d 72, 85 (1st Cir. 2003).

Finally, SPC claims that its damages should be reduced because Sjöström made no effort to mitigate his damages.  The contract provided and the district court found that "Sjöström's right either to be permitted to work his notice period or to receive compensation in lieu thereof was absolute."  Rathje, 2002 U.S. Dist. LEXIS 4078, at * 43.  Sjöström therefore did not have a duty to mitigate damages.

## C.  Officers' Alternative Theory

The Officers assert that even if they resigned, they entered into a later contract with Hudson.  In an email message to the Officers, after Hudson writes that he considers the Officers resigned, he writes:

> As [the Officers] have resigned there seems to be no requirement to pay termination.  On the other hand I believe the [Rathje] and [Persson] contracts would normally provide for termination of two or three months if the Company had terminated their employment.  I am prepared to pay this sum to each on an ex gratia basis, given a proper and fully cooperative handover to the satisfaction of ISP during the next 14 days.

(Emphasis added.)  Asked for clarification by the Officers, Hudson reiterated his offer in another email message, also noting that Sjöström was entitled to termination pay in his capacity as chief engineer.

-11-

The Officers claim that they worked through April 20, satisfying their obligation under the new contract, but did not receive any pay for their termination periods.  Thus, they assert that SPC is in breach and liable for damages.

The Officers contend that the court improperly excluded evidence of this new contract as an inadmissible offer of settlement.  They maintain that the district court should have read their complaint broadly to incorporate two claims - one for breach of employment contract, and one for a separate contract formed after employment had ceased.  SPC argues that the district court <u>did</u> consider both arguments, and implicitly found that no new contract was formed.

### 1.  Were two claims litigated?

Upon review of the record, we find that the district court did not consider the issue of whether or not a separate contract was formed between SPC and the Officers.  At trial, the court stated that it was "clear that this is a claim of breach of an employment contract."  The district court admitted the above email messages only "for the purpose of completeness of the story of the parties' ongoing dealings rather than as proof of SPC's liability for, or the invalidity of, a claim or its amount."  <u>Rathje</u>, 2002 U.S. Dist. LEXIS 4078, at *24, n.13, *26, n.15, *27, n.16.

In its findings of fact, the court stated only that "[n]egotiations between Hudson and the Plaintiffs concerning his offered 'ex gratia' payments broke down." Id. at *27. In its conclusions of law, the court considered Hudson's email messages offering termination pay only for their potential effect on a breach of employment claim by the Officers -- and found that there was no effect because the employment had already ceased when the statements were made. Id. at *45-46. It is therefore clear that the court read the complaint only to incorporate a breach of employment claim, and not to also include a breach of a separate contract between the parties.

## 2. Was it error to exclude the alternative theory?

We now consider whether it was error for the district court to exclude the claim. A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for judgment for the relief the pleader seeks." Fed. R. Civ. P. 8(a). This simplified pleading standard must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957). A breach of contract complaint must allege (1) the existence of a valid and binding contract; (2) that plaintiff has complied with the contract and performed his own obligations under it; and (3) breach of the contract causing damages. 5 Wright

& Miller, <u>Federal Practice and Procedure</u> § 1235, at 268-70 (2d ed. 2002).

The Officers claim that the following language identifies a claim for breach of a separate contract:

> [T]he plaintiffs conferred by facsimile and/or emails on several occasions resulting in the wrongful termination of plaintiffs. <u>In any event</u>, defendants agreed that plaintiff's last day of work would be April 20, 2001 and that they would be paid their wages, vacation days and time off in accordance with their contracts for that period of time that there was to be a notice of termination as stated in their contracts.

(Emphasis added.)

While the Officers' complaint clearly establishes a breach of employment contract claim, it fails to set forth the basic elements to show that a separate contract was formed by the parties after conclusion of the employment relationship. The complaint states that "defendants agreed" that plaintiffs would work two weeks and be paid their notice of termination period but does not explain how this agreement arose, whether it was a binding contract, whether plaintiffs performed under the contract, and whether defendants breached the contract. It therefore is insufficient to establish a claim for breach of a subsequent contract. The district court properly read the complaint to only include a breach of employment contract claim.

### D. Maintenance Cross-Appeal

Finally, SPC appeals the decision that the Officers were not liable for negligent maintenance of the vessel. There was conflicting testimony about the extent or existence of damage to the vessel, and the court found only that SPC may incur additional cost as a result of negligent maintenance of the wood railings, doors, and deck. There is nothing to suggest that the district court's findings as to upkeep were clearly erroneous.

It is unclear whether SPC attempts to make a breach of employment contract claim, a fiduciary duty claim, or a negligence claim, but it is irrelevant because each claim is meritless. Nothing in the Officers' employment contracts mentions upkeep of the vessel, no testimony suggested that the Officers were required to maintain the vessel, and the record is absent of any discussion by the parties regarding any such duty. The breach of employment contract therefore fails.

Both a breach of fiduciary duty and negligence claim are predicated upon a duty owed by the Officers to the ship owner. Here, however, SPC claims only to be the operator of the SCOTIA PRINCE. It introduced no evidence to show that it owned the vessel and, in fact, the record shows the owner to be Transworld Steamship Company (Panama), Inc. Even if SPC were somehow analogous to an owner, SPC's claim for negligent maintenance would fail. While a seaman has a duty to perform the duties of his position with

diligence, faithfulness, and reasonable skill, <u>see generally</u> 2 Norton, <u>The Law of Seaman</u> § 25.16 (4th ed. 1985), SPC has not shown that any of the Officers were responsible for maintaining the woodwork on the vessel. There is no authority in the lengthy history of admiralty cases to support the position that, on these facts, the Officers can be held liable (under a fiduciary or negligence theory) to the owner of the vessel for non-intentional negligent maintenance, and we refuse to establish such jurisprudence here.

## IV. Conclusion

The decision of the district court is **<u>affirmed</u>**. No costs are awarded to either side.