# United States Court of Appeals
## For the First Circuit

No. 19-1503

QBE SEGUROS,

Plaintiff, Appellee,

v.

CARLOS A. MORALES-VÁZQUEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Bruce J. McGiverin, U.S. Magistrate Judge]

Before

Barron and Selya, Circuit Judges,
and Katzmann, Judge.[*]

Alberto J. Castañer, with whom Castañer & Cía P.S.C., Juan Rafael González-Muñoz, and González Muñoz Law Offices, PSC were on brief, for appellant.
Manuel Sosa-Báez, with whom Ian P. Carvajal and Saldaña, Carvajal & Vélez-Rivé, P.S.C. were on brief, for appellee.

January 19, 2021

---

[*] Of the United States Court of International Trade, sitting by designation.

**SELYA**, **Circuit Judge**.  This appeal involves a dispute between a boat owner (who purchased a policy of marine insurance without disclosing, among other things, a prior grounding) and his insurance company.  Resolving the appeal requires us to revisit the doctrine of uberrimae fidei — an entrenched principle of maritime law that imposes a duty of utmost good faith on the parties to marine insurance contracts.  Concluding, as we do, that the district court faithfully applied this doctrine, we affirm the entry of judgment in favor of the insurer.

## I. BACKGROUND

We briefly rehearse the relevant facts and travel of the case.  In 2011, defendant-appellant Carlos Morales-Vázquez (Morales) purchased an insurance policy for his forty-foot Riviera yacht (the Riviera Policy) from Optima Insurance Company, an entity later acquired by another insurance company, plaintiff-appellee QBE Seguros (QBE).  As part of his application for this insurance policy, Morales left blank the spaces provided for answers to questions asking him to describe his prior boating history and all accidents related to any vessel he had previously owned, controlled, and/or operated.  Morales renewed this policy (with QBE) in both 2012 and 2013.

In March of 2014, Morales applied for a separate insurance policy for his forty-eight-foot Cavileer yacht (the Cavileer Policy).  Section seven of the application required

Morales to disclose any accidents or losses sustained in connection with any vessel he had owned, controlled, and/or operated. This time, Morales indicated that he had been involved in an accident some eleven years earlier, explaining that the accident was a "propeller strike" and that "[p]ropellers were replaced [and] shaft and rudders rectified." But Morales did not see fit to mention that in January of 2010 he had grounded a forty-foot Riviera Offshore yacht in Fajardo, Puerto Rico.

The omission of the earlier grounding was not Morales's only oversight. Section six of the application for the Cavileer Policy required Morales to recount his boat-ownership and boat-operating history. When responding, Morales listed only two of the seven boats that he previously had owned and/or operated (a forty-foot Riviera Offshore yacht and a forty-foot Riviera Sport Fisherman). He omitted the remaining information called for by section six even though the application form plainly stated that "[i]f incorrect answers are provided (either by error, omission or neglect), I will be in breach of this warranty and the policy, if issued, will be void from inception."

Morales submitted the application for the Cavileer Policy to an insurance broker, who contacted an underwriter at QBE. The broker indicated that the putative insured wanted to obtain a quote the same day. Thirty-six minutes after receiving the application, the underwriter quoted a premium to the broker.

- 3 -

In pricing the quotation, the underwriter relied, among other things, on the information contained in the applications for both the Riviera Policy and the Cavileer Policy, as well as Morales's "more than 15 years" of nautical "owner experience." QBE Seguros v. Morales-Vázquez, No. 15-2091, 2018 WL 3763305, at *1-3 (D.P.R. Aug. 7, 2018). She later testified at trial that she had evaluated the paperwork thoroughly before authorizing the issuance of the policy. The net result of the dealings between the broker and the underwriter was that, as of March 7, 2014, Morales's Cavileer yacht was insured by QBE for the ensuing year in the face amount of $550,000.

On October 24, 2014, the Cavileer yacht sustained appreciable damage from a fire. Morales reported the loss to QBE, and QBE retained an independent adjustor to work with its own employees toward resolving Morales's claim. Following a number of surveys, QBE made a settlement offer in December of 2014: it offered to pay Morales $63,774.10 in satisfaction of the loss. Morales rejected the offer.

Negotiations between the parties continued over the next few months, and Morales rejected several other settlement offers from QBE. The tectonic plates shifted, though, in May of 2015, when QBE became aware of Morales's 2010 grounding. QBE exercised its right to question Morales under oath, and Morales admitted that he had not disclosed the 2010 grounding — nor had he disclosed

(in his application for the Cavileer Policy) the existence of five vessels that he previously had owned and/or operated.

With Morales's admissions in hand, QBE repaired to the federal district court in mid-2015. Invoking the court's admiralty jurisdiction, see 28 U.S.C. § 1333, QBE sought a declaratory judgment voiding the policy on the grounds that Morales had failed to honor his duty of utmost good faith (known as "uberrimae fidei" in maritime law) in acquiring the Cavileer Policy and, in the bargain, had breached the warranty of truthfulness contained in the Cavileer Policy. Morales answered QBE's complaint, denied that QBE was entitled to the relief that it sought, asserted affirmative defenses of waiver and estoppel, and counterclaimed for damages arising out of QBE's alleged bad faith. The parties consented to proceed before a magistrate judge, see 28 U.S.C. § 636(c); Fed. R. Civ. P. 73, and — following preliminary motion practice and extensive pretrial discovery — they cross-moved for full or partial summary judgment. The district court denied both motions, but noted the relevance of the doctrine of uberrimae fidei and QBE's corresponding right to void the Cavileer Policy if Morales had made a material omission or misrepresentation.

A six-day bench trial ensued. The district court reserved decision, entertained post-trial briefing, and decided the case in a thoughtful rescript. The court concluded that QBE was entitled to void the policy for two independently sufficient

reasons:  Morales had breached not only the duty of uberrimae fidei but also the policy's warranty of truthfulness.  See QBE, 2018 WL 3763305, at *16.  In connection with the latter holding, the court rejected Morales's affirmative defenses.  See id. at *12-14.  This timely appeal followed.

## II. ANALYSIS

In this venue, Morales propounds four arguments.  First, he asks that we hold the doctrine of uberrimae fidei inapplicable because of recent legal developments in the United Kingdom.  Second, he says that even if the doctrine applies generally, the district court made no finding that QBE actually relied on his omissions and, thus, erred in holding that he had breached the duty.  Third, he argues that the district court erred in finding that he breached the warranty of truthfulness.  And finally, he argues that his affirmative defenses trump any right that QBE may have had to void the Cavileer Policy.  The first two arguments are obviously related, and we discuss them together.  As matters turn out, the resolution of those arguments suffices to lay this appeal to rest.

Given the thrust of Morales's first argument, we think it useful to start by sketching the evolution of the doctrine of uberrimae fidei.  The Latin phrase "uberrimae fidei" loosely translates as "utmost good faith."  See Black's Law Dictionary (10th ed. 2014).  As relevant here, the doctrine requires parties

- 6 -

to a marine insurance contract to disclose all known facts or circumstances material to an insurer's risk.  See Windsor Mount Joy Mut. Ins. Co. v. Giragosian, 57 F.3d 50, 54-55 (1st Cir. 1995). Under the doctrine, an insurer may void a marine insurance policy if its insured fails to disclose "all circumstances known to [the insured] and unknown to the insurer" that materially impact the insurer's risk calculus.  Caitlin at Lloyd's v. San Juan Towing & Marine Servs., Inc., 778 F.3d 69, 83 (1st Cir. 2015) (emphasis in original); cf. Stipcich v. Metro. Life Ins. Co., 277 U.S. 311, 316 (1928) (holding to like effect with respect to certain contracts outside marine insurance context).

The origins of the doctrine can be traced back to eighteenth-century London, which was — and remains — a global insurance hub.  In its nascent form, the doctrine applied to a myriad of insurance contracts across a wide swath of industries. As early as 1766, Lord Mansfield recognized that insurance contracts impose a heightened duty of good faith to prevent a party from omitting or concealing facts that would induce the counterparty "into a bargain, from his ignorance." Carter v. Boehm (1766) 97 Eng. Rep. 1162, 1164 (K.B.).  Such a requirement was rooted in practical wisdom, recognizing that an insurer often lacked the ability to verify the insured's representations before issuing a policy.  See Thomas J. Schoenbaum, Admiralty and Maritime Law § 19:14, at 460 (6th ed. 2018).  This practical wisdom still

rings true when applied to marine insurance — an industry in which, for example, a policy may have to be issued in London, on a time-sensitive basis, for a vessel berthed halfway across the globe.

American courts first recognized the doctrine of uberrimae fidei in connection with marine insurance contracts in the early nineteenth century. See McLanahan v. Universal Ins. Co., 26 U.S. (1 Pet.) 170, 185 (1828). In 1882, the Supreme Court confirmed the strict disclosure requirements that the doctrine imposed on an insured. See Sun Mut. Ins. Co. v. Ocean Ins. Co., 107 U.S. 485, 510-11 (1883).

For some time, American and English law concerning marine insurance continued to develop in parallel through a parade of judicial decisions. Parliament, however, codified the by-then-venerable doctrine of uberrimae fidei by including it in the Marine Insurance Act of 1906 (1906 MIA). See Marine Insurance Act 1906, 6 Edw. 7 c. 41, § 17 (U.K.). Congress, however, remained silent; and American courts continued to develop their own federal common law of admiralty and continued to interpret marine insurance policies as incorporating, by implication, the doctrine of uberrimae fidei. See, e.g., San Juan Towing, 778 F.3d at 82; N.Y. Marine & Gen. Ins. Co. v. Cont'l Cement Co., 761 F.3d 830, 839 (8th Cir. 2014); AGF Marine Aviation & Transp. v. Cassin, 544 F.3d 255, 263 (3d Cir. 2008); Certain Underwriters at Lloyd's, London v. Inlet Fisheries Inc., 518 F.3d 645, 650 (9th Cir. 2008); HIH

Marine Servs., Inc. v. Fraser, 211 F.3d 1359, 1362 (11th Cir. 2000); Puritan Ins. Co. v. Eagle S.S. Co. S.A., 779 F.2d 866, 870 (2d Cir. 1985).[1]

Parliament lately adopted a number of insurance reforms. As relevant here, Parliament passed the Insurance Act of 2015, which (among other things) effectively amended the 1906 MIA to preclude an insurer from voiding a marine insurance policy by recourse to the doctrine of uberrimae fidei. See Insurance Act 2015, c.4, § 14 (U.K.) ("Any rule of law permitting a party to a contract of insurance to avoid the contract on the ground that the utmost good faith has not been observed by the other party is abolished."). Even so, Congress did not follow Parliament's lead.

This lack of congressional action is significant. As the federal common law of admiralty developed, the Supreme Court acknowledged that congressional silence left room for courts,

---

[1] There appears to be only a single outlier. See Albany Ins. Co. v. Anh Thi Kieu, 927 F.2d 882, 889 (5th Cir. 1991). This decision not only flies in the teeth of case law from both the Supreme Court and the overwhelming majority of circuits but also has been much-criticized. See, e.g., Inlet Fisheries, 518 F.3d at 653 (questioning the "logic chain" of Anh Thi Kieu); Thomas J. Schoenbaum, The Duty of Utmost Good Faith in Marine Insurance Law: A Comparative Analysis of American and English Law, 29 J. Mar. L. & Com. 1, 11 (1998) (calling into question Anh Thi Kieu decision because "no rule of marine insurance is better established tha[n] the utmost good faith rule").

among others, to fill the vacuum.[2]  See Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 321 (1955) ("We, like Congress, leave the regulation of marine insurance where it has been — with the States.").

Against this backdrop, Morales contends that Supreme Court precedent requires courts to harmonize American and United Kingdom maritime law and that, therefore, uberrimae fidei would have to be scuttled (even if it included a requirement to prove reliance) to match what Parliament wrought in the Insurance Act of 2015.  This contention poses a question of law, which engenders de novo review.  See Giragosian, 57 F.3d at 53.

Morales does not dispute that uberrimae fidei is firmly entrenched in the jurisprudence of this circuit.  See San Juan Towing, 778 F.3d at 80-81 (holding "without further equivocation that the doctrine of uberrimae fidei is an established rule of maritime law in this Circuit").  He nonetheless urges us to disregard our own precedent, insisting that a trio of Supreme Court cases compels us to do so.  See Calmar S.S. Corp. v. Scott, 345

---

[2] This means, of course, that questions sometimes arise in maritime cases as to whether federal or state common law should apply.  See San Juan Towing, 778 F.3d at 76-80.  Here, however, the parties present their uberrimae fidei arguments exclusively in terms of federal common law, and we therefore may accept the parties' plausible view that federal common law supplies the substantive rules of decision.  Cf. Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991) (holding that, in diversity jurisdiction, court may accept parties' plausible agreement as to which state's law applies).

U.S. 427, 442-443 (1953); <u>Standard Oil Co. of N.J.</u> v. <u>United States</u>, 340 U.S. 54, 59 (1950); <u>Queen Ins. Co. of Am.</u> v. <u>Globe and Rutgers Fire Ins. Co.</u>, 263 U.S. 487, 493 (1924). The rule that Morales draws from these cases is that, in admiralty, federal common law should be tailored (or re-tailored, if necessary) to mirror developments in English law. This is magical thinking: the cases upon which Morales relies cannot bear the weight that he loads upon them. We explain briefly.

To begin, the quoted statements that Morales excerpts from his coveted trio of Supreme Court cases are dictum. None of them are meant to establish a binding analytic framework. And when all is said and done, Morales identifies no case in which the Court based a holding on English law. To confirm these points, we examine the cases that Morales cites.

In <u>Queen Insurance</u>, the Court was tasked with deciding, for insurance purposes, whether the sinking of a commercial vessel traveling with a military convoy resulted from "marine risks" or "war risks." 263 U.S. at 490. To resolve this conundrum, the Court looked primarily to a Court of Claims opinion, see <u>Morgan</u> v. <u>United States</u>, 5 Ct. Cl. 182, 194 (1869), which itself drew on English insurance law principles, see <u>Queen Insurance</u>, 263 U.S. at 492-93. Although Justice Holmes noted that "special reasons [exist] for keeping in harmony with the marine insurance laws of

England," id. at 493, the Court's holding was in no way based on English law.

In Calmar, the dispute involved a privately insured ship which — as a result of the attack on Pearl Harbor — was diverted to Australia and detained there. See 345 U.S. at 428-29. While detained, the ship was damaged by enemy bombing. See id. at 430. The parties quarreled over whether the ship's insurance policy afforded coverage, and the lower court based its resolution of this controversy in part on a House of Lords decision. See id. at 442 (citing Rickards v. Forrestal Land, Timber and Rys. Co. (1942) A.C. 50). On review, the Supreme Court cited an analogous English case as "persuasive authority," but made plain that it was "not required" to adopt that particular interpretation. Id. at 443.

The third case to which Morales adverts also involved war risk insurance. There, the insured alleged that certain House of Lords decisions, which detoured from the traditional proximate cause inquiry, dictated the outcome. See Standard Oil Co. of N.J., 340 U.S. at 59, 60 n.12 (citing Yorkshire Dale S.S. Co. v. Minister of War Transp. (1942) A.C. 691; Bd. of Trade v. Hain S.S. Co. (1929) A.C. 534; Attorney-General v. Adelaide S.S. Co. (1923) A.C. 292). Although the Court acknowledged the general "desirability of uniformity" between American and English law in the interpretation of marine insurance policies, it cautioned that "this does not mean that American courts must follow House of

- 12 -

Lords' decisions automatically."  Id. at 59.  Practicing what it preached, the Court declined to follow the English precedents hawked by the insured.  Id. at 61.

Standard Oil offers us two important takeaways.  First, American courts are not bound by legal developments in the United Kingdom.  And even though the Standard Oil Court was speaking of judicial decisions, we think it follows, a fortiori, that acts of Parliament are equally non-binding.  Second, although harmony between American and English admiralty law is desirable, "our practice is no more than to accord respect to established doctrines of English maritime law."  Id. at 59.  The respect accorded by American courts to English maritime law stems from the wisdom of the particular doctrine, not from either the acceptance or the rejection of that doctrine by Parliament.  It follows, we think, that federal courts tasked with hearing admiralty cases should take heed of developments in English law, but they are not obliged to change course merely because Parliament acts to alter a previously entrenched principle.

Let us be perfectly clear.  We do not gainsay that federal common law is intended to be dynamic and to evolve over time.  See, e.g., Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO, 451 U.S. 77, 95-96 (1981) (discussing federal courts' role in developing "flexible" common law of admiralty).  But Congress has been conspicuously silent on issues of marine

insurance, see Wilburn Boat Co., 348 U.S. at 321, and the fact that federal common law has the capacity to evolve does not mean that it is captive to the vagaries of Parliament (or any foreign legislature, for that matter).

At any rate, abandoning the doctrine of uberrimae fidei in marine insurance cases would have rebarbative consequences, both upending settled law and disrupting an industry that has long been premised on insureds telling the whole truth to insurers. Given this grim prospect, we decline Morales's invitation to remove the doctrine of uberrimae fidei from service and place it in mothballs.

There are, of course, sound reasons to retain the challenged doctrine. Although the availability of information has improved dramatically in recent times, a marine insurer and its insured do not have equal access to the information needed to make underwriting decisions and to set premiums. Long ago, Lord Mansfield famously wrote that "[i]nsurance is a contract upon speculation. The special facts, upon which the contingent chance is to be computed, lie most commonly in the knowledge of the insured only." Carter 97 Eng. Rep. at 1164. This remains true in the sphere of marine insurance. Thus, even though uberrimae fidei has been scuttled in other areas of insurance law, see San Juan Towing, 778 F.3d at 75, the peculiarities of marine insurance underscore the case for its continued desirability.

This proposition hardly can be disputed. Marine insurance is often needed at a moment's notice, and insurers are frequently located far away from the vessel that they are asked to insure. See id. at 80. The insurer's task is made more formidable because the calculation of marine insurance premiums must take into account not only the vessel's history and particularities but also the maritime experiences of the owner and/or operator. Time is frequently critical to the issuance of marine insurance policies, and this wide constellation of facts is difficult for an insurer to ascertain on short notice unless it has the full and frank cooperation of the insured. See generally Mitchell J. Popham & Chau Vo, Misrepresentation and Concealment in Marine Insurance Contracts: An Analysis of Federal and State Law Within the Ninth Circuit, 11 U.S.F. Mar. L.J. 99, 104 (1998).

So, too, the asymmetry in the availability of information argues convincingly for the idea that the doctrine of uberrimae fidei is necessary for the maintenance of an economically efficient marine insurance industry. Requiring an insurer to ascertain difficult-to-find information about a risk will impose substantial costs on the industry — costs that are likely to be passed along to policyholders in the form of higher premiums. Placing the burden of disclosure on the insured (the party who knows or can most easily obtain the necessary information) will reduce processing costs and will help to keep premiums low. As

one commentator aptly observed, uberrimae fidei is not "based on 'old fashioned' moral principles . . . [i]t is a rule designed to minimize costs to both insurers and assureds."  Schoenbaum, The Duty of Utmost Good Faith, supra note 1, at 3.  The doctrine, therefore, remains "grounded in economic efficiency."  Id.

This case is a poster child for the continuing relevance of the doctrine.  Morales admits that QBE's underwriter was "pressed for time because Morales needed the insurance for that same day."  To accommodate Morales, QBE moved rapidly; it delivered the requested coverage to Morales just thirty-six minutes after his broker submitted his application.  In other words, the stringent burden of disclosure allowed Morales to obtain marine insurance in a matter of minutes.

Even so, clear sailing is not yet in sight.  Morales argues that, even if uberrimae fidei remains applicable to marine insurance in American jurisprudence, the district court misapplied the doctrine because it did not make any finding that QBE actually relied on the insured's incomplete accident history and other omissions.  To the extent that this claim of error turns on a question of law, our review is de novo.  See Giragosian, 57 F.3d at 53.  To the extent that it implicates the district court's factfinding, our review is for clear error.  See id.

Morales's argument posits that QBE must show that it actually relied on his omissions in issuing the Cavileer Policy.

This argument strikes a novel chord:  we have never held that actual reliance is a necessary prerequisite for an insurer to void a marine insurance policy under the doctrine of uberrimae fidei. Rather, we have held that the materiality of a false statement or an omission, without more, provides a sufficient ground for voiding such a policy.  See, e.g., San Juan Towing, 778 F.3d at 83; Com. Union Ins. Co. v. Pesante, 459 F.3d 34, 37-38 (1st Cir. 2006); Grande v. St. Paul Fire & Marine Ins. Co., 436 F.3d 277, 282-83 (1st Cir. 2006); Giragosian, 57 F.3d at 54-55.  Several other courts of appeals likewise have concluded that a showing that an omission or a representation relates to a material fact is alone sufficient to void a marine insurance policy.  See, e.g., Inlet Fisheries, 518 F.3d at 655; AGF Marine Aviation, 544 F.3d at 262; HIH Marine Servs., 211 F.3d at 1363.  The commenters agree that, under federal common law, the majority rule does not require actual reliance in marine insurance cases.  See, e.g., Schoenbaum, Admiralty and Maritime Law, supra, at 480; W. Benjamin Woody, Sinking Uberrimae Fidei: How the Eighth Circuit's Decision in St. Paul Fire & Marine Insurance Co. v. Abhe & Svoboda, Inc., Accidentally Sank the Doctrine Before the Insurance Act 2015 Could, 40 Tul. Mar. L.J. 573, 584-85 (2016).

In an effort to blunt the force of these authorities, Morales claims that three circuits — the Eleventh, Second, and

Eighth — have required a showing of actual reliance. Morales's claim, though, overstates the matter.

Caselaw from the Eleventh Circuit contravenes Morales's claim. The case that he cites stands only for the unremarkable proposition that misrepresentation of a prior loss known to both parties "could not have led [the insurer] to rely on that statement" and, thus, could "in no way constitute a material misrepresentation in breach of uberrimae fidei." I.T.N. Consolidators, Inc. v. N. Marine Unders. Ltd., 464 Fed. Appx. 788, 794 (11th Cir. 2012) (dictum). That case was decided on other grounds, see id. at 795, and the Eleventh Circuit elsewhere has stated unequivocally that a material misrepresentation, without more, is a sufficient basis for voiding a marine insurance policy under uberrimae fidei, see HIH Marine Servs., 211 F.3d at 1363.

The Second Circuit is more of a mixed bag. In the case that Morales cites, the court merely assumed, without deciding, that actual reliance was necessary. See Fireman's Fund Ins. Co. v. Great Am. Ins. Co., 822 F.3d 620, 638 (2d Cir. 2016). But our independent research indicates that the Second Circuit may, indeed, require actual reliance when applying uberrimae fidei. See Puritan, 779 F.2d at 871.

The Eighth Circuit case that Morales cites is favorable authority for his position. See St. Paul Fire & Marine Ins. Co. v. Abhe & Svoboda, Inc., 798 F.3d 715, 721 (8th Cir. 2015). Even

- 18 -

so, that court recognized that its holding was contrary to the weight of authority.  See id.  And in all events, the opinion is suspect because the Abhe court looked to insurance law outside the marine insurance context, see id. at 720-21, and failed to acknowledge in any way the special relationship between marine insurance and the doctrine of uberrimae fidei.

In the end, we are not persuaded by Morales's argument.  For one thing, binding precedent does not support the inclusion of an actual reliance requirement within the doctrine of uberrimae fidei.  The Supreme Court has used only a materiality test — without any mention of actual reliance — in describing the preconditions for the application of uberrimae fidei in marine insurance cases.  See Sun Mut. Ins. Co., 107 U.S. at 509-10.  And in this circuit's jurisprudence, materiality alone has consistently been recognized as a sufficient predicate for finding that an insured breached his duty of uberrimae fidei.  See, e.g., San Juan Towing, 778 F.3d at 83.

For another thing, Morales does not argue in the alternative that we should impose an actual reliance requirement regardless of controlling precedent.  He does no more than cite some out-of-circuit cases that follow the minority rule to support his claim that our precedent also requires actual reliance.  These references are insufficient to support departure from our existing precedent.  We hold, therefore, that the majority rule continues

to abide in this circuit; that under the majority rule, a showing of actual reliance is not required; and that QBE had no need to show that it actually relied on Morales's omissions in order to prevail under the doctrine of uberrimae fidei.[3]

Morales makes yet another effort to bail the water out of his sinking ship. He submits that certain language in the Cavileer Policy modified the traditional duty of uberrimae fidei and incorporated actual reliance into the contract. Specifically, he points to two provisions:

- A clause appearing on the bottom of each page of the application, which states, "I also agree that if the policy is issued, it was issued by you based upon and in reliance of the truthfulness and completeness of the answers provided herein."

- A sentence in the "General Conditions and Warranties" section of the Cavileer Policy, which states, "This policy was issued based upon and in reliance of the representations made by you or your representative in the Application."

Contrary to Morales's importunings, this language does nothing to water down the duty of uberrimae fidei. These provisions appear

---

[3] We note QBE's insistence that actual reliance occurred here. Like the district court, we have no need to reach that factbound issue.

- 20 -

to be little more than boilerplate contract terms, and we agree with the district court that neither of them amounts to an unambiguous statement modifying the duty of utmost good faith inherent in marine insurance contracts. See QBE, 2018 WL 3763305, at *7. To cinch the matter, other language in the Cavileer Policy makes pellucid that the parties did not intend to diminish the duty of uberrimae fidei:

> If the named insured has, before or after a loss made a false statement or representation with respect to this insurance or has concealed or misrepresented any material fact or circumstance relating to this insurance, this policy shall be void and without effect. The false statement or representation or concealment need not be related to the damages or loss claimed in order to void the entire policy.

This language embodies the core of the uberrimae fidei doctrine: that omission or misrepresentation of a material fact is a sufficient ground, in and of itself, to allow an insurer to void a policy of marine insurance.

For the sake of completeness, we note that our analysis of the contractual language does not offer any reason to move away from the overarching doctrine of uberrimae fidei. Quite the contrary: the contractual language provides strong support for the conclusion that the doctrine of uberrimae fidei is alive and well in marine insurance policies. Although the disclosure requirements in the contract align with those imposed by the

doctrine of uberrimae fidei, contractual requirements may operate as affirmative defenses. For example, waiver and estoppel may be affirmative defenses to a claim that an insured has committed a breach of a policy warranty, see, e.g., In re Frescati Shipping Co., 718 F.3d 184, 214 (3d Cir. 2013); Suydam v. Reed Stenhouse of Wash., Inc., 820 F.2d 1506, 1510 (9th Cir. 1987), and Morales asserts them here. But he develops no argument on appeal that these defenses apply against the doctrine of uberrimae fidei. See HIH Marine Servs., 211 F.3d at 1362 n.2.

It is true, of course, that omitted facts must be material in order to provide an avenue for an insurer to void an insurance policy under the doctrine of uberrimae fidei. See San Juan Towing, 778 F.3d at 83; Giragosian, 57 F.3d at 54-55. For such purposes, materiality depends upon an objective standard. See San Juan Towing, 778 F.3d at 82; see also Schoenbaum, Admiralty and Maritime Law, supra, at 480. Materiality is to be gleaned by evaluating the likely impact of facts that may influence a prudent insurer when considering whether to issue a particular policy. See Pesante, 459 F.3d at 38.

Here, the district court found that the incomplete accident history (most notably, the earlier grounding) crossed the threshold for materiality. See QBE, 2018 WL 3763305, at *8-9. On appeal, Morales makes no developed argument to the contrary. Given this unchallenged finding of materiality, the district court had

an impeccable predicate for applying the doctrine of uberrimae fidei.

We need go no further. From what we already have said, it is evident that the court below carefully threaded its way through the doctrinal complexities of uberrimae fidei and supportably concluded that the doctrine entitled QBE to a declaration that the Cavileer Policy was void.[4]

## III. CONCLUSION

The judgment of the district court is

**Affirmed.**

---

[4] Given our conclusion that the district court did not err in ruling that Morales breached the duty of uberrimae fidei, we have no occasion to reach the parties' arguments concerning breach of the warranty of truthfulness, waiver, and estoppel.